# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00420-CV

---

**Stephanie Muth, in Her Official Capacity as Commissioner of the Texas Department of Family and Protective Services, and the Texas Department of Family and Protective Services, Appellants**

**v.**

**Mirabel Voe, Individually and as Parent and Next Friend of Antonio Voe, a Minor, and Wanda Roe, Individually and as Parent and Next Friend of Tommy Roe, a Minor, Appellees**

---

## NO. 03-22-00587-CV

---

**Stephanie Muth, in Her Official Capacity as Commissioner of the Texas Department of Family and Protective Services, and the Texas Department of Family and Protective Services, Appellants**

**v.**

**PFLAG, Inc. and Adam Briggle and Amber Briggle, individually and as parents and next friends of M.B., a minor, Appellees**

---

### FROM THE 459TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-22-002569, THE HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

---

## <u>O P I N I O N</u>

This appeal arises out of the appellees' suit to enjoin appellants from investigating appellees for child abuse after appellants announced that providing gender-affirming medical care to minors constitutes child abuse.[1]

The individual appellees are Mirabel Voe, individually and as parent and next friend of Antonio Voe, a minor; Wanda Roe, individually and as parent and next friend of Tommy Roe, a minor; and Adam Briggle and Amber Briggle, individually and as parents and next friends of M.B., a minor (collectively, "Individual Appellees").[2]  We refer to Mirabel Voe, Wanda Roe, Adam Briggle, and Amber Briggle collectively as the "Parents"; and to Antonio Voe, Tommy Roe, and M.B. collectively as the "Minors."  Appellee PFLAG, Inc. was founded in 1973 by a mother and her gay son and is the first and largest organization dedicated to supporting, educating, and advocating for lesbian, gay, bisexual, transgender, and queer (LGBTQ+) people, their parents and families, and allies.  PFLAG is a network of over 250 local chapters throughout the United States; there are 17 chapters in Texas.  Individuals who identify as LGBTQ+ and their parents, families, and allies join PFLAG directly or through one of its local chapters.  Out of the approximately 250,000 members and supporters nationwide, over 600 members are in Texas.  PFLAG asserts its

---

[1]  In this opinion, "gender-affirming medical care" refers to the use of puberty blockers and hormone therapy for the treatment of diagnosed gender dysphoria.  As explained in more detail later in this opinion, "gender dysphoria," as recognized by the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), refers to the condition experienced by some transgender people of clinically significant distress resulting from the lack of congruence between their gender identity and the sex assigned to them at birth.  Under current clinical guidelines, only transgender adolescents and adults are provided gender-affirming medical care; no medical treatment is recommended or necessary before the onset of puberty.

[2]  All appellees except Adam Briggle and Amber Briggle are proceeding under pseudonyms to protect their privacy.  *See* Tex. R. Civ. P. 21c(a)(3), (b); Tex. R. App. P. 9.9 (a)(3), (b); *cf.* Tex. R. App. P. 9.8 (requiring identification of minors by aliases in parental-rights termination cases).

claims in the lawsuit on behalf of its members. We refer to the Individual Appellees and PFLAG collectively as the "Families."

Appellants, Stephanie Muth, in her official capacity as Commissioner of the Texas Department of Family and Protective Services, and the Texas Department of Family and Protective Services (individually, "Commissioner" and "DFPS"; collectively, "Department"), challenge the trial court's grant of two temporary injunctions prohibiting them from implementing or enforcing "a new rule" that "expand[ed] the definition of 'child abuse'" and mandated an investigation of caregivers who are providing gender-affirming medical care (which the trial court defined as the "DFPS Rule").[3] For the reasons explained below, we conclude that the trial court has jurisdiction and properly exercised its discretion in issuing the temporary injunctions. Consequently, we affirm the trial court's grant of those injunctions.

## BACKGROUND

*The Department Issues a Statement*

The underlying dispute arises from actions taken by the Department after the Attorney General issued an opinion on February 18, 2022, concluding that dispensing certain drugs to children with gender dysphoria could constitute "child abuse," as defined by the Texas Family Code. *See* Tex. Att'y Gen. Op. No. KP-0401 (2022), 2022 WL 579379. On February 22, 2022,

---

[3] When these appeals were filed, Jaime Masters, in her official capacity as Commissioner of the Texas Department of Family and Protective Services, was an appellant. Effective January 2, 2023, Stephanie Muth became the Commissioner. We have substituted Commissioner Muth as an appellant in the appeals, as required by Texas Rule of Appellate Procedure 7.2. *See* Tex. R. App. P. 7.2 (requiring that "public officer's successor is automatically substituted as a party if appropriate" when public officer ceases to hold office while appeal is proceeding if public officer is party to appeal in official capacity).

the Governor wrote a letter to the Commissioner ("Governor's Directive"), enclosing the Attorney General's opinion, which he described as confirming that the "administration of puberty-blocking drugs or supraphysiologic[al] doses of testosterone and estrogen" constitutes child abuse under existing Texas law, citing the definition of "abuse" found in Texas Family Code Section 261.001(1)(A)-(D).

The Governor directed the Department "to conduct a prompt and thorough investigation of any reported instances of these abusive procedures in the State of Texas." The Governor emphasized that "Texas law imposes reporting requirements upon all licensed professionals who have direct contact with children who may be subject to such abuse, including doctors, nurses, and teachers, and provides criminal penalties for failure to report such child abuse" and that members of the general public have similar reporting requirements and are subject to similar criminal penalties. The Governor further instructed the Department that it "must follow the law as explained in OAG Opinion No. KP-0401" by investigating parents whose children are "subjected to these abusive gender-transitioning procedures."[4] That same day, the Department issued the following statement to the media:

---

[4] In August 2021, the Governor had sent a letter to the Commissioner, requesting that she "issue a determination whether genital mutilation of a child for purposes of gender transitioning through reassignment surgery constitutes child abuse." The Governor pointed out that classifying reassignment surgery as child abuse would also impose a duty on the Department to conduct prompt and thorough investigations of the child's parents and that other state agencies would be obliged to investigate the facilities they license. As requested, the Commissioner responded with a letter declaring that "[g]enital mutilation of a child through reassignment surgery is child abuse, subject to all rules and procedures pertaining to child abuse." The letter explained the reporting requirements for licensed professionals who have direct contact with children through their job, as well as the penalties for failure to report. The letter closed by stating that "allegations involving genital mutilation of a child through reassignment surgery will be promptly and thoroughly investigated and any appropriate actions will be taken."

The record reflects that the Department had not been notified of any allegations related to reassignment surgery, and thus, it had never opened any investigations of child abuse based on

4

> In accordance with Governor Abbott's directive today to Commissioner Masters, we will follow Texas law as explained in Attorney General opinion KP-0401.
>
> At this time, there are no pending investigations of child abuse involving the procedures described in that opinion. If any such allegations are reported to us, they will be investigated under existing policies of Child Protective Investigations.

("Department Statement").[5] As noted in the Department's Statement, at that time there were no pending investigations of child abuse based on allegations involving the procedures described in the Attorney General's opinion.

*The Department Begins Investigating Families Based on Reports Alleging Administration of Puberty Blockers or Hormone Therapy*

Chapter 261 of the Texas Family Code governs investigations of reports of child abuse or neglect. *See generally* Tex. Fam. Code §§ 261.001-505. The Texas Legislature has tasked the Department with making "a prompt and thorough investigation of a report of child abuse or neglect allegedly committed by a person responsible for a child's care, custody, or welfare." *Id.*

---

allegations of reassignment surgery as of July 5, 2022. The Court notes that the Families' expert attested in her declaration that "[g]ender affirming surgeries that can result in sterilization as a side effect are not recommended for and are not typical practice in minors with gender dysphoria. As per the current guidelines of care, transgender individuals must be over the age of majority to make this decision in consultation with their medical providers." As discussed in more detail below, the Department's investigations at issue here involve reports that parents are providing their children with gender-affirming medical care for diagnosed gender dysphoria.

[5] For simplicity, we will refer to the Department's February 22, 2022 statement and subsequent implementation of policies related to the expanded definition of "child abuse" as the "Department Statement," and we will analyze below the Families' contention that the Department Statement announced a new rule implementing the Governor's Directive and the Department subsequently adopted procedures implementing that new rule without following the rulemaking provisions of the Administrative Procedures Act. Our references to the Department Statement refer to what the trial court defined as the DFPS Rule in its orders—the Department's "new rule expanding the definition of 'child abuse' to presumptively treat the provision of gender-affirming medical care . . . as necessitating an investigation."

§ 261.301(a). The Family Code requires the Commissioner to "by rule assign priorities and prescribe investigative procedures for investigations based on the severity and immediacy of the alleged harm to the child." *Id.* § 261.301(d).

The Department assigns investigations of reported abuse a priority designation based on the severity of the alleged harm to the child and the immediacy of the risk. 40 Tex. Admin. Code § 707.485 (2020) (Dep't of Fam. & Prot. Serv., Timeframe for Response). The Department's priority designations are Priority 1 (P1), Priority 2 (P2), and Priority None (PN). According to the Department's Child Protective Services (CPS) Handbook, the Department usually assigns a P1 designation when the following circumstances are present:

(1) a report that a child appears to face an immediate threat to his or her safety or is in immediate risk of abuse or neglect that could result in death or serious harm;

(2) any report alleging abuse or neglect that is received within 12 months after a previous investigation was closed as "Unable to Complete"; or

(3) a report involving a child's death that has never been investigated, and there is a clear allegation that the death was the result of alleged abuse or neglect, even if no other children are in the home.

According to Rule 707.485, the Department usually assigns a P2 designation when the case involves allegations of abuse or neglect that do not involve an immediate risk of serious harm and does not otherwise meet the criteria for P1 assignment. *Id.* According to the CPS Handbook, P2-designated cases in which the youngest victim is age six or older must be formally screened. The CPS Handbook states that a report may be classified as PN in three situations: (1) "[a]n incident of abuse or neglect may have met legal definitions when the past incident occurred, but at the time of the new report, no current dangers exist, and there is no known risk of recurrence";

6

(2) "[e]ssential information is needed from a specific collateral or principal to determine whether an allegation of abuse or neglect is assignable [for investigation]"; (3) a child death has been reported and "[n]o allegations pertain to other children in the home" and "[t]he child fatality has already been investigated and dispositioned by [the Child Protective Investigations division of DFPS (CPI)]." A report may be classified as PN by a CPI screener when the report "[d]oes not meet the criteria for an investigation" and "intervention by DFPS is not needed."

After the Department issued its Statement to the media, it subsequently began receiving reports involving the alleged administration of gender-affirming medical care. According to Marta Talbert, DFPS's Director of Field Investigations, who supervises the regional directors throughout Texas, the Department instructed staff not to PN these cases.[6] Randa Mulanax, a former CPS investigation supervisor, testified about how the Department instructed its employees to treat these cases after the Department Statement was issued, and she corroborated that employees were told that "these cases were not eligible for priority none status or a PN if it fit the current policy and that they were also not eligible for administrative closure if it fit the current policy." Mulanax testified that this instruction was a change from prior policy "because the only other cases prioritized that way were child death investigations or cases involving children in conservatorship."[7]

Talbert testified that normally an investigation begins with contacting the reporter of the alleged child abuse first to gather any additional information, checking criminal and CPS

---

[6] Talbert testified at the temporary-injunction hearing.

[7] Mulanax also testified that employees "were instructed not to put anything about these cases in writing via email or text message through our work devices, and we were only to staff them through phone calls or in person or through Teams and that we were to refer to them as specific cases I believe was the verbiage."

history to see if there is any information available on the alleged perpetrator of the abuse, and then attempting to see and interview the alleged victim child before speaking to the parents or alerting them of the allegations against them. In gender-affirming-care cases, the Department also tries to find out who the child's medical providers are and to contact them to gather information about the child's medical treatment.

Talbert testified that the potential dispositions of a Department investigation are the following: "rule out," which means the Department does not find "any preponderance of evidence of abuse or neglect"; "reason to believe," which means the Department does find evidence of abuse or neglect; "UTD" or "unable to determine," which means the Department knows abuse occurred but does not know who the perpetrator is; and "UTC" or "unable to complete," which usually means the family left and the Department cannot find them. Talbert further testified that after an investigation is complete, and the disposition is anything other than "unable to complete," if "the exact same complaint c[a]me back in," the Department would not investigate the case again.

*The Department Investigates Reports of Gender-Affirming Medical Care to Determine Whether the Care Is Medically Necessary or Otherwise Harmful*

The Attorney General's opinion specified that it "does not address or apply to *medically necessary* procedures," Op. at *1 (emphasis added), and it characterizes the provision of puberty blockers and hormone therapy for gender dysphoria as not medically necessary and infringing upon a minor child's constitutional right to procreate. *Id.* at *4-6. The Attorney General further opined:

> Even where the procedure or treatment does not involve the physical removal or alteration of a child's reproductive organs (*i.e.* puberty blockers), these procedures and treatments can cause "mental or emotional injury to a child that results in an observable and material impairment in the child's growth, development, or

8

psychological functioning" by subjecting a child to the mental and emotional injury associated with lifelong sterilization—an impairment to one's growth and development.

*Id.* at \*9. Thus, the Attorney General concluded that a court could find these procedures and treatments to be child abuse under Family Code Section 261.001(1)(A)-(D) where they are not medically necessary or are otherwise harmful. *Id.* As the Department stated in its response to the Families' application for temporary injunction, after receiving this guidance from the Attorney General and the Governor, the Department "made the determination that it would investigate reports involving allegations of . . . the use of pubertal blockers and hormone therapy (PBHT) on a child where such medication may not be medically necessary or [is] otherwise harmful."

The Families allege in their petition that the Attorney General's opinion "did not take into account the medical consensus that certain procedures described in the [opinion]— including puberty blockers and hormone therapy—*are* medically necessary when prescribed to treat gender dysphoria" and that as a result, the Department began investigating families "for child abuse based on reports that the families have followed doctor-recommended treatments for their adolescent children."

*The Lawsuit*

After the Department opened investigations into the Parents based solely on reports that their minor children have been prescribed medical care for their diagnosed gender dysphoria, the Individual Appellees, along with PFLAG, sued the Commissioner, DFPS, and the Governor on June 8, 2022. In their petition, the Families asserted six claims: (1) a declaratory-judgment claim that the new rule announced in the Department Statement is an invalid rule under the Texas Administrative Procedure Act (APA), Tex. Gov't Code Ch. 2001, *see also id.* § 2001.038(a); (2) a

declaratory-judgment claim that the Governor's and Commissioner's actions are ultra vires; and constitutional claims that (3) the Governor's and Commissioner's actions violate the separation of powers established by Article II of the Texas Constitution, *see* Tex. Const. art. II, § 1; (4) the Governor's Directive and the new rule announced in the Department's Statement are unconstitutionally vague, *see* Tex. Const. art. I, § 19; (5) the Governor and the Commissioner are depriving the Parents and PFLAG members of their fundamental parental rights; and (6) the Governor and the Commissioner are violating the guarantee of equal rights and equality under the law for the Minors and the children of PFLAG members.[8]  The Families sought temporary injunctive relief against the Commissioner and DFPS solely on the ground that the Department's Rule violates the APA both procedurally and substantively.  The Families sought permanent injunctive relief against the Commissioner and DFPS on all grounds asserted in the petition.

The Commissioner and the Department filed a response to the Families' application for temporary injunction, in which the Commissioner and the Department challenged both the trial court's jurisdiction and the merits of the Families' claims.  On July 6, 2022, the trial court conducted a one-day evidentiary hearing, which included testimony from the parties' fact witnesses and experts.[9]

---

[8]  The Families attached to their petition the following exhibits: declaration of Samantha Poe (a PFLAG member); affidavit of Lisa Stanton (a PFLAG member); expert declaration of Cassandra C. Brady, M.D.; declaration of Brian K. Bond (PFLAG's executive director); declaration of Mirabel Voe; declaration of Wanda Roe; declaration of Tommy Roe; and affidavit of Adam Briggle.

[9]  The trial court heard testimony from two of the Individual Appellees, Mirabel Voe and Wanda Roe, and from Brian Bond, the executive director of PFLAG.  In addition, Randa Mulanax and Cassandra Brady, M.D., testified on behalf of the Families.  Mulanax is a former DFPS investigation supervisor for CPS who was employed there at the time of the Department Statement. Dr. Brady is a Board-certified general pediatrician and pediatric endocrinologist, who is an assistant professor of general pediatrics at the Vanderbilt University Medical Center and the

The trial court signed an order granting the Voes' and Roes' applications for temporary injunction on July 8, 2022 ("Voe Injunction"). The trial court signed an order granting PFLAG's and the Briggles' applications for temporary injunction on September 16, 2022 ("PFLAG Injunction"). In both orders, the trial court determined that the Families stated a valid cause of action against the Commissioner and DFPS and that they presented evidence that satisfied their burden to show a probable right to the declaratory and permanent injunctive relief they seek. Specifically, the court stated that "there is a substantial likelihood that [the Families] will prevail after a trial on the merits" because the "DFPS Rule was adopted without following the necessary procedures under the APA, is contrary to DFPS's enabling statute, is beyond the authority provided to the Commissioner and DFPS, and is otherwise contrary to law."

The trial court found that "gender-affirming medical care . . . was not investigated as child abuse by DFPS until after February 22, 2022." Thus, the trial court found, "[t]he DFPS Rule changed the *status quo* for transgender children and their families," and "[t]he DFPS Rule was given the effect of a new law or new agency rule, despite no new legislation, regulation or even valid agency policy."

By finding that the Families had stated valid causes of action, the trial court necessarily determined that, based on the evidence presented, it has subject-matter jurisdiction over their claims. The court made its finding that it has subject-matter jurisdiction explicit by

clinical director of two clinics, the Differences of Sex Clinic and a gender-dysphoria clinic for adolescents; she also provided an expert declaration with the Families' petition. The Department offered testimony from James Cantor, Ph.D, a clinical psychologist in Canada, and Marta Talbert, DFPS's Director of Field Investigations. The trial court excluded Cantor's report that the Department offered into evidence. The trial court also excluded an expert declaration and report from Michael K. Laidlaw, M.D., and the declaration of Stephen Black, a DFPS employee, on hearsay grounds.

concluding in the PFLAG Injunction that PFLAG has standing and the Briggles' claims are ripe. The trial court also held that, absent injunctive relief, the Families would "suffer probable, imminent, and irreparable injury," including but not limited to:

- being subjected to an unlawful and unwarranted child abuse investigation;

- intrusion and interference with parental decision-making;

- the deprivation or disruption of medically necessary care for the parents' adolescent children;

- the chilling of the exercise of the right of Texas parents to make medical decisions for their children relying upon the advice and recommendation of their health care providers acting consistent with prevailing medical guidelines;

- intrusion into the relationship between patients and their health care providers;

- gross invasions of privacy in the home and school, and the resulting trauma felt by parents, siblings, and other household members;

- outing an adolescent as transgender;

- adverse effects on grades and participation in school activities;

- fear and anxiety associated with the threat of having a child removed from the home;

- increased incidence of depression and risk of self-harm or suicide;

- having to uproot their lives and their families to seek medically necessary care in another state;

- being placed on the child abuse registry and the consequences that result therefrom; and

- criminal prosecution and the threat thereof.

(Bullet points added.)

The temporary injunctions enjoin the Department from "implementing or enforcing" the DFPS Rule (as defined by the trial court) against the Families, including PFLAG members who are not parties to the suit. The Department is specifically restrained from (1) investigating the Families "for possible child abuse or neglect _solely_ based on allegations that they have a minor child or are a minor child who is gender transitioning or alleged to be receiving or being prescribed medical treatment for gender dysphoria;" and (2) from taking any investigatory or adverse actions against the Families with investigations that have already been opened on this basis other than to administratively close them.

The Department filed separate appeals from the Voe Injunction and the PFLAG Injunction, which automatically superseded the injunctions. _See_ Tex. Civ. Prac. & Rem. Code § 6.001(a)-(b); Tex. R. App. P. 29.1(b). The Voes and Roes requested emergency relief from this Court, seeking reinstatement of the Voe Injunction during the appeal, which we granted. _Masters v. Voe_, No. 03-22-00420-CV, 2022 WL 4359561, at *3 (Tex. App.—Austin, Sept. 20, 2022, order) (per curiam). PFLAG and the Briggles also requested emergency relief, seeking reinstatement of the PFLAG Injunction, which this Court provisionally granted while considering the emergency motion, ultimately leaving the reinstatement of the temporary injunction in place for the pendency of this appeal. _Masters v. PFLAG, Inc._, No. 03-22-00587-CV, 2022 WL 4473903, at *1 (Tex. App.—Austin Sept. 26, 2022, order) (per curiam).

On the Department's unopposed motion, the Court consolidated the two appeals for briefing and consideration.

13

## ANALYSIS

Although the Department identifies five "issues presented," we will group and address its issues consistent with the manner in which it presented those issues (and others) in the argument section of its brief: (1) whether the Families have standing to bring their APA challenge to the Department Statement; (2) whether the Families' claims are ripe; (3) whether the Roe and Briggle Appellees' claims are moot; (4) whether sovereign immunity is waived for the Families' APA challenge to the Department Statement; (5) whether the Families satisfied the requirements for a temporary injunction by demonstrating (i) a probable right to the relief sought, (ii) that the injunctions preserve the status quo, and (iii) that the injunctions prevent a probable, imminent, and irreparable injury.[10]

There are two preliminary matters that affect our analysis of all of the Department's appellate issues. First, we address a recurring theme in the Department's presentation of its issues and the Families' response to those issues. Throughout its briefing, the Department characterizes the Families' allegations as only alleging injuries from the Department's investigations of each of their individual families. The Families, however, allege a much broader scope of injury arising

---

[10] The Department identifies the following five "issues presented" in its brief: (1) the Department's investigations do not cause a cognizable injury sufficient to confer standing to sue on the Families; (2) the APA's waiver of sovereign immunity for challenges to the validity or applicability of agency rules should not apply to (a) communications between the Governor and an executive agency or (b) an executive agency's statement to the press about the agency's internal operations; (3) the Commissioner was not acting ultra vires but instead was exercising discretion conferred upon her by statute when she agreed with the Governor's and Attorney General's interpretation of the law and decided to initiate investigations based on that interpretation; (4) the temporary injunction changes the status quo rather than maintaining it, and thus constitutes an abuse of discretion, because DFPS has the statutory authority to assess and investigate reports of child abuse; (5) a trial court abuses its discretion by issuing a temporary injunction that protects against harm that is speculative and not imminent.

from the Department Statement, as well as from the Department's subsequent investigations. While the Families do allege a myriad of serious harms resulting from the investigations (see the trial court's list above of probable, imminent, and irreparable injuries), the heart of their suit is the injury to their fundamental constitutional rights—the injury to the Parents' fundamental right to direct their children's medical care and the Minors' right to receive equal medical treatment—as we discuss in more detail below.[11] The Families assert that the allegedly invalid rule impairs their rights because the Department's policy of mandatory investigations means that parents must choose whether to follow the course of care prescribed by their children's doctors and thus subject themselves to investigation for child abuse or to stop following their doctors' prescribed course of care and risk harm to their children.

Second, when addressing its various jurisdictional challenges to the Families' suit, the Department frequently addresses claims alleged by the Families that are not relevant to its interlocutory appeal of the temporary injunctions. The Families moved for the temporary injunctions solely on their APA claims. Therefore, we address only the Department's arguments that are relevant to the Families' APA claims and only to the extent necessary to address the Department's jurisdictional arguments and the propriety of the temporary injunctions.[12]

---

[11] The Families allege that these harms are also suffered by all PFLAG members with transgender children and those children.

[12] For this reason, to the extent that the Department makes jurisdictional or other arguments about the Governor's conduct, we need not address those in this appeal. *See* Tex. R. App. P. 47.1.

## I.  Standing

We first consider the threshold issue of whether the Individual Appellees have standing to sue.  "Standing is a constitutional prerequisite to maintaining suit."  *Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 646 (Tex. 2004); *see also Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 443-44 (Tex. 1993) (explaining standing requirement stems from two constitutional limitations on subject-matter jurisdiction—separation-of-powers doctrine, which prohibits advisory opinions, and open-courts provision, which contemplates access to courts only for litigants suffering injury).  Standing requires plaintiffs to demonstrate that they possess an interest in a conflict distinct from that of the general public, such that the actions complained of have caused them some particular injury.[13]  *See Williams v. Lara,* 52 S.W.3d 171, 178-79 (Tex. 2001) (citing *Hunt v. Bass*, 664 S.W.2d 323, 324 (Tex. 1984) ("Standing consists of some interest peculiar to persons individually and not as members of the general public.")).

"Generally, standing involves a threshold determination of whether a plaintiff has a sufficient 'justiciable interest' in the suit's outcome to be entitled to a judicial determination."  *In re H.S.*, 550 S.W.3d 151, 155 (Tex. 2018).  Absent standing, a court lacks subject-matter jurisdiction over the suit, "and the merits of the plaintiff's claims thus cannot be litigated or decided."  *Id.*; *see also Brown v. Todd*, 53 S.W.3d 297, 305 (Tex. 2001) ("The standing doctrine

---

[13] "Constitutional standing requires that at least one plaintiff demonstrate they have suffered a concrete and particularized injury that is fairly traceable to the challenged action and is likely to be redressed by a court ruling in the plaintiff's favor."  *Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661, 668 (8th Cir. 2022) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)); *see also, e.g.*, *Heckman v. Williamson County*, 369 S.W.3d 137, 153 (Tex. 2012) (concluding that only one plaintiff need have standing when "there are multiple plaintiffs in a case, who seek injunctive or declaratory relief (or both), who sue individually, and who all seek the same relief" because "if that plaintiff prevails on the merits, the same prospective relief would issue regardless of the standing of the other plaintiffs").

identifies those suits appropriate for judicial resolution."). Thus, our analysis of whether the Individual Appellees have standing is not a decision about whether they "will prevail in their suit; it is about whether they may bring it in the first place." *In re H.S.*, 550 S.W.3d at 155.

Standing, like other issues implicating a court's subject-matter jurisdiction (such as ripeness and mootness), is a question of law that we review de novo. *Id.*; *see also Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998) (addressing ripeness). "In evaluating standing, we construe the pleadings in the plaintiff's favor, but we also consider relevant evidence offered by the parties." *In re H.S.*, 550 S.W.3d at 155 (citing *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000); *Texas Ass'n of Bus.*, 852 S.W.2d at 446).

In their first issue, the Department contends that (1) the Individual Appellees lack standing because they did not show an actual or imminent injury and (2) PFLAG lacks associational standing because it cannot satisfy any of the requirements.

In their petition, the Families seek declaratory relief under Section 2001.038(a) of the APA. Section 2001.038(a) establishes that

> [t]he validity or applicability of a rule, including an emergency rule adopted under Section 2001.034, may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff.

Tex. Gov't Code § 2001.038(a). "An agency rule is invalid if (1) the agency had no statutory authority to promulgate it; (2) it was not promulgated pursuant to proper procedure; or (3) it is unconstitutional." *Williams v. Texas State Bd. of Orthotics & Prosthetics*, 150 S.W.3d 563, 568 (Tex. App.—Austin 2004, no pet.) (quoting *Railroad Comm'n v. ARCO Oil & Gas Co.*, 876 S.W.2d 473, 477 (Tex. App.—Austin 1994, writ denied), *superseded by statute on other grounds as stated*

*in Lower Laguna Madre Found., Inc. v. Texas Nat. Res. Conservation Comm'n*, 4 S.W.3d 419, 425 (Tex. App.—Austin 1999, no pet.)).

The Families challenge the validity or applicability of the Department Statement for three reasons. First, the Families allege that the Department Statement constitutes a "rule" under the APA, and that the Commissioner bypassed mandatory APA procedures for rule promulgation. Second, they allege that the Department Statement conflicts with the Department's enabling statute, exceeding the Department's authority and rendering the Department Statement a facially invalid rule. Third, they allege that the Department Statement is an invalid rule because its application interferes with their fundamental parental rights and other equality and due-process guarantees of the Texas Constitution. With the Families' claims about the invalidity of the alleged Department rule in mind, we consider the Individual Appellees' standing to sue the Department.

### A.  Individual Appellees' Standing

The Department contends that the Individual Appellees cannot satisfy the requirement for standing that "a plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Texas Propane Gas Ass'n v. City of Houston*, 622 S.W.3d 791, 799 (Tex. 2021) (quoting *In re Abbott*, 601 S.W.3d 802, 807 (Tex. 2020) (orig. proceeding) (per curiam) (explaining that "[t]he Texas standing requirements parallel the federal test for Article III standing . . . .")). The Department challenges only the "injury in fact" component of standing, which requires the Individual Appellees to show they have suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted). We understand the

Department's argument to be that the Individual Appellees have not adequately shown an actual or imminent harm from the Department Statement that allegedly establishes a new rule in violation of the APA's rulemaking procedures, as well as allegedly being a facially invalid rule and unconstitutional. The Department contends that "[t]he bare existence of an investigation is not a legally cognizable injury," that the Individual Appellees' alleged harm that the Department "would find child abuse occurred based solely on allegations that a child is transgender and taking [pubertal blockers and hormone therapy] . . . is nothing more than a hypothetical future risk," and that the theoretical possibility that the Department might seek a subpoena or otherwise take action against the parents is not enough to establish standing now.

In response, the Individual Appellees assert that they have standing for two reasons: (1) because "*unlawful* investigations constitute legally cognizable harm—regardless of the outcome of such investigations" and (2) because the Department's unlawful promulgation and implementation of the Department Statement as a new rule have caused and will continue to cause (in the absence of injunctive relief) "significant, ongoing, and irreparable harm far beyond an 'investigation.'" In addition, the Families contend that the Department fails to read the Families' allegations as pleaded. *See Texas Ass'n of Bus.*, 852 S.W.2d at 446 (explaining that when reviewing standing for first time on appeal instead of on appeal from dismissal for want of jurisdiction, court "must construe petition in favor of the party [whose standing is challenged], and if necessary, review the entire record to determine if any evidence supports standing").

In their petition, the Families allege that the Department's unlawful acts, including the adoption and implementation of the Department Statement as an invalid rule, interfere with or impair, or threaten interference with or impairment of, three legal rights or privileges. They assert that the allegedly invalid rule (1) deprives them of their rights to due process because the new rule

19

is unconstitutionally vague, (2) violates the Parents' fundamental rights to direct their children's medical care, and (3) violates the Minors' rights to equality under the law. On appeal, they focus primarily on the allegedly invalid rule's violation of the Parents' rights to direct their children's medical care and the Minors' rights to receive medically necessary treatment for gender dysphoria, when the same treatments may be prescribed to cisgender individuals for other reasons. We will consider whether they have sufficiently alleged concrete and particularized, actual or imminent harm to those latter two legally protected interests.

### 1. The Department Statement Impairs the Individual Appellees' Fundamental Rights

For our standing analysis, we need to determine whether the Individual Appellees have adequately alleged and the record supports that they have suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" *Lujan*, 504 U.S. at 560 (citations omitted). To demonstrate standing under Section 2001.038, the Individual Appellees'

> pleadings must contain more than conclusory statements that their rights have been or probably will be impaired. The pleadings must allege, or the record must demonstrate, facts showing how a particular rule has already interfered with the plaintiffs' rights or how that rule in reasonable probability will interfere with the plaintiffs' rights in the future.

*Finance Comm'n of Tex. v. Norwood*, 418 S.W.3d 566, 592 (Tex. 2013) (Johnson, J. concurring and dissenting). Construing the Individual Appellees' pleadings in their favor, as we must, they allege that the "sudden and substantive changes reflected in [the Department's] new rule, and the sudden shift in longstanding agency policies . . . had immediate and harmful effects across the

state," as well as upon each of their families. Soon after the Department's Statement, the Department opened an investigation into each of the Parents, solely on the basis of reports that the Minors have been prescribed medical care for their diagnosed gender dysphoria. We examine below whether the Individual Appellees' allegations and record evidence supports their claim that the Department's allegedly invalid new rule and the subsequent investigations have interfered with or in reasonable probability will interfere with the Individual Appellees' rights in the future.

### a. Allegations of Legally Protected Interests

The Individual Appellees assert that this initiation of investigations against each of them is an invasion of the Parents' protected interest in the "fundamental right of parents to make decisions concerning the care, custody, and control of their children." *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (charting history of precedent supporting this right and stating that "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children"). "This natural parental right has been characterized as 'essential,' 'a basic civil right of man,' and 'far more precious than property rights.'" *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (quoting *Stanley v. Illinois,* 405 U.S. 645, 651 (1972)); *see also, e.g.*, *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976) ("The natural right which exists between parents and their children is one of constitutional dimensions." (collecting United States Supreme Court cases)). "The Texas Legislature has likewise recognized that parents are presumed to be appropriate decision-makers, giving parents the right to consent to their [child's] medical care and surgical treatment." *Miller ex rel. Miller v. HCA, Inc.*, 118 S.W.3d 758, 766 (Tex. 2003); *see also* Tex.

Fam. Code § 151.001(a)(3) (parents have right and duty "to support the child, including providing the child with . . . medical and dental care").

The Texas Constitution also provides that all persons "have equal rights," Tex. Const., art. I, § 3, and "[e]quality under the law shall not be denied or abridged because of sex," *id.* art. I, § 3a. The Individual Appellees allege that the Department's Statement targets the Minors on the basis of their sex because the Department's decision to investigate the provision of puberty blockers and hormone therapy as "child abuse" only targets the provision of those treatments to transgender youth, not to cisgender youth who are prescribed the medication for other reasons. *See, e.g.*, *Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661, 668 (8th Cir. 2022) (determining that statute prohibiting healthcare professionals from providing "gender transition procedures" is subject to heightened scrutiny because it distinguishes on basis of sex who may receive certain types of medical care and who may not). As an example, a cisgender male may be prescribed testosterone without fear that his family will be targeted for investigation, but a transgender male (who was assigned the sex of female at birth) may not.

**b. Allegations of Harms from Investigations**

Each Individual Appellee offered testimony about the impact these investigations have had on their families—the significant amount of fear, stress, and anxiety and accompanying physical symptoms that they, the Minors, and their other children have suffered because of the Department's investigations. One of the Minors attempted suicide on the day that he learned of the Governor's Directive to the Department, and the outpatient psychiatric facility that the hospital referred him to subsequently reported his mother as an alleged perpetrator of child abuse after the staff learned that he had been prescribed medication for the treatment of his diagnosed gender

dysphoria. The Minors, all of whom were interviewed by Department investigators either at their homes or after being pulled out of class at school, either missed school or transitioned away from in-person school to remote school for some amount of time, and all struggled to focus in school, resulting in a deterioration in their academic performance after the investigations into their families began. All of the Parents fear that their children will be taken away from them. They fear for their children's physical and mental health and safety because of the stress and anxiety that the investigations are causing the children.

####  c.  Allegations and Evidence Presented About Medical Necessity of Treatment for Gender Dysphoria

All of the Parents testified that they have been following the advice and seeking the guidance and expertise of their children's healthcare providers about what treatment is medically necessary for their children's diagnosed gender dysphoria. All of them also testified to their concern that if they failed to follow the advice, guidance, and counseling of their children's physicians and mental-health professionals about what treatment is medically necessary for their children's gender dysphoria, there would be detrimental short-term and long-term physical and mental-health consequences for their children. The Families attached an expert declaration to their petition and offered testimony at the temporary-injunction hearing from Cassandra Brady, M.D., a board-certified general pediatrician and pediatric endocrinologist, who is an assistant professor of general pediatrics at the Vanderbilt University Medical Center and the clinical director of two clinics, the Differences of Sex Clinic and a gender-dysphoria clinic for adolescents.[14] Dr. Brady

---

[14] A bibliography is attached to Dr. Brady's declaration and expert report containing a numbered list of scientific journal articles and other reports that she relied upon in making her report and as additional support for her opinions. Dr. Brady's declaration and expert report

attested that while "individuals are given a sex at birth based typically on their genital anatomy[,] [r]esearch . . . has shown that determination of sex is far more complex than what is seen on genital exam," and "sex is a complex compilation of multiple factors, including one's chromosomal make up," gonadal sex, fetal hormonal sex, pubertal hormonal sex, and gender identity."

Dr. Brady further explained that for each of the above factors contributing to the development of sex, there can be variations, meaning that the "sex-related characteristics do not always align as either completely male or completely female," and that these variations are common. She attested that "[g]ender identity is an individual's inner sense of belonging to a particular gender," explaining that "[i]ndividuals whose sex and gender identity align are cisgender. Individuals whose sex and gender identity do not match are transgender/gender diverse. Research has shown that gender identity has a strong biological basis and cannot be voluntarily changed." (Endnote reference numbers omitted.) Dr. Brady attested to the timeline of children's development of self-awareness of their gender identity, explaining that many children have a clear sense of their own gender identity by age three to seven, but some individuals do not develop a sense and awareness of what their gender identity is until later into pubertal age or adolescence. She further attested that "[e]xperts agree that being transgender is a normal variation of human development. The medical community at large considers attempts at changing one's gender identity to be a futile, harmful, and unethical treatment approach." (Endnote reference number omitted.)

Dr. Brady further attested that "[w]hile all individuals have a gender identity, not everyone's gender identity is that of their sex assigned at birth. When this happens in transgender

references the articles in her bibliography; accordingly, our discussion indicates when endnote reference numbers referencing the articles in the bibliography have been omitted from quotations.

24

individuals (i.e., a lack of alignment of assigned sex and gender identity), it can cause significant distress which is referred to as gender dysphoria." (Endnote reference number omitted.) According to Dr. Brady, "Gender Dysphoria (capitalized) is the medical diagnosis for the significant distress that results from the incongruity between one's gender identity and sex assigned at birth. It is a serious medical condition, and it is codified in the American Psychiatric Association's Diagnostic Manual of Mental Disorders, Fifth Edition (DSM-5)." (Endnote reference number omitted.) Dr. Brady attested to the DSM-5's definition of gender dysphoria as the following:

> [a] marked difference between the individual's expressed/experienced gender and the gender others would assign him or her, and it must continue for at least six months. In children, the desire to be of the other gender must be present and verbalized. This condition causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.
>
> [G]ender dysphoria is manifested in a variety of ways, including strong desires to be treated as the other gender or to be rid of one's sex characteristics, or a strong conviction that one has feelings and reactions typical of the other gender.

(Endnote reference number omitted.)

Dr. Brady testified about the numerous criteria for the medical diagnoses of gender dysphoria both in children and in adolescents and adults, which are codified in the DSM-5.[15] Both conditions are associated with "clinically significant distress or impairment" "in social circles, school, or other important areas of functioning" (for children) and in "social, occupational, or other

---

[15] A diagnosis of "Gender Dysphoria in Children" applies to pre-pubertal children and requires the manifestation of at least six of eight listed criteria evidencing "[a] marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months duration." A diagnosis of "Gender Dysphoria in Adolescents and Adults" requires the manifestation of at least two of six criteria evidencing "[a] marked incongruence between experienced/expressed gender and assigned gender, of at least 6 months duration."

important areas of functioning" (for adolescents and adults). Dr. Brady attested that "[g]iven that gender dysphoria can cause such distress, many transgender individuals face depression, anxiety, and higher rates of suicidality than cisgender people," but that "these risks do decline when transgender individuals are supported and live according to their gender identity." (Endnote reference numbers omitted.)

Dr. Brady also attested in great detail to the evidence-based clinical guidelines for the care of gender dysphoria that are peer reviewed and recognized by professional medical societies, including the American Academy of Pediatrics and the Pediatric Endocrine Society. She attested that medication treatment is not recommended in prepubertal minors, but "[o]nce a patient enters puberty, treatment options include pubertal suppression therapy and gender affirming hormones." She further testified at length about both the safety of and risks associated with the use of puberty blockers and hormone therapy in youth for the treatment of gender dysphoria, as well as other conditions.

Dr. Brady testified to various dangers both from withholding pubertal suppression and hormone therapy from young people with gender dysphoria when it is medically indicated and from withdrawing treatment once it has been initiated. In particular, she testified that "[i]f we do not provide treatment to adolescents with gender dysphoria, they may have an increased risk for anxiety, depression, and suicide depending on where they are with their mental health." She also attested that "it is at least as dangerous to withdraw treatment once it has been initiated as it is to withhold the initiation of treatment. Abruptly stopping gender affirming, medically necessary

26

therapies causes mental and physical harm."[16]  In their petition, the Individual Appellees summarized the dilemma that they face as follows:

> Parents and families across the state of Texas are fearful that if they follow the recommendations of their medical providers to treat their adolescent children's gender dysphoria, they could face investigation, criminal prosecution, and the removal of their children from their custody. . . . They are also afraid that if they do not pursue this medically prescribed and necessary care for their children in order to avoid investigation and criminal prosecution, their children's mental and physical health will suffer dramatically.

The Individual Appellees have alleged a myriad of serious injuries from the Department Statement and the resulting investigations, such as the fear and anxiety associated with the threat of having a child removed from their home, the increased incidence of depression and risk of self-harm or suicide for the Minors, and the adverse effects on the Minors' grades and participation in school activities.  We conclude that the Individual Appellees' allegation that the Department Statement is impairing or interfering with the Parents' right to make medical decisions for their children in consultation with and upon the recommendation of their medical providers (who are acting in accordance with prevailing medical guidelines) constitutes an invasion of their legally protected interests to direct their children's medical care, as well as an invasion of the Minors' right to seek such care, sufficient to establish their standing to challenge the allegedly invalid rule.  The Department Statement's effect exists separate and apart from the Department's actual investigations of the Individual Appellees.  Next, we turn to the Department's contention that the investigations themselves cannot constitute a legally cognizable injury.

---

[16] The Families alleged in their petition that "[f]aced with the purported changed definition of 'child abuse' under Texas law, some medical providers temporarily discontinued medically necessary care for transgender adolescents with gender dysphoria."

27

### 2. The Department's Investigations Have Invaded the Individual Appellees' Legally Protected Interests

The Department argues that the Department's investigations of the Individual Appellees are not evidence of a legally cognizable injury because an investigation alone merely creates a "theoretical possibility" that they could be injured in the future by Department action against them. We disagree. The petition alleges and the record supports that the Department Statement and the Department's implementation of that Statement have subjected the Individual Appellees to invasive mandatory investigations for child abuse solely based on reports that their children are transgender and they have sought gender-affirming medical care for their children.[17] Although the Department asserts that "[t]he bare existence of an investigation is not a legally cognizable injury," the case they rely on for that proposition, *Laird v. Tatum*, 408 U.S. 1 (1972), is distinguishable from the situation presented here. In *Laird*, the United States Supreme Court held that the plaintiffs lacked standing to challenge an Army intelligence-gathering program. *Id.* at 11-16. The plaintiffs alleged that the Army's surveillance of lawful and peaceful civilian political activity violated their rights. *Id.* at 2. The Court considered whether the plaintiffs had presented a justiciable controversy through their allegation that "the exercise of [their] First Amendment rights is being chilled by the mere existence, without more, of a governmental investigative and data-gathering activity that is alleged to be broader in scope than is reasonably necessary for the

---

[17] Although the Department asserts in its brief that "none of the individual Appellees have become the subject of an investigation based *purely* on the fact that their child is transgender and receiving [pubertal blockers and hormone therapy]," it provides no record citation to evidence that supports this conclusory assertion. The Department presented no evidence at the hearing supporting its assertion that there was any other basis for the investigations of the Individual Appellees.

accomplishment of a valid governmental purpose."[18] *Id.* at 10. The Court concluded that the plaintiffs had failed to allege a specific present objective harm or a threat of specific harm. *Id.* at 13-14. Contrasting the case with other cases in which allegations of a chilling effect of governmental regulations presented a justiciable controversy, the Court explained that in those cases, "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging." *Id.* at 11.

In this case, the Individual Appellees are presently and prospectively subject to the regulation that they are challenging. They are or have been the subject of invasive investigations by the Department based on the Department's enforcement of the allegedly invalid new rule. This is more than a threatened and "certainly impending" injury—this is injury that has already occurred. *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410, 420 (2013) (concluding that speculative fear that U.S government would target plaintiffs' communications with foreign contacts under challenged surveillance law relied on "highly attenuated chain of possibilities" and "mere conjecture about possible governmental actions" thus did not satisfy "requirement that

---

[18] The Court explained that the information-gathering system had been put into place after President Johnson had ordered federal troops to assist local authorities during civil disorders in 1967 in Detroit and following the assassination of Dr. Martin Luther King in 1968 because the Army determined it should do additional preparatory planning for providing such assistance to local authorities and it needed more information "to be able to respond effectively with a minimum of force" when called upon to assist local authorities. *Laird v. Tatum*, 408 U.S. 1, 4-5 (1972). In describing the Army's information-gathering system, the Court explained that "[t]he information itself was collected by a variety of means, but it is significant that the principal sources of information were the news media and publications in general circulation" and that some of the information came from Army Intelligence agents who attended meetings that were open to the public. *Id.* at 6. In other words, the principal sources of information were public in nature. In contrast, here, the Department's investigations seek private medical information.

threatened injury must be certainly impending"). Actually being investigated by the Department only heightens the chilling effect and impairment that the Department's Statement imposes on the Parents' fundamental right to direct their children's medical care and the Minors' right to equal treatment under the law and is an invasion of their legally protected interests. Moreover, now that the Department is actually investigating them, the Parents are subject to a real threat of likely civil actions against them should the Department conclude that the care that the Minors are receiving for their gender dysphoria is not medically necessary and thus constitutes child abuse. *See Patel v. Texas Dep't of Licensing & Regulation*, 469 S.W.3d 69, 78 (Tex. 2015) (concluding plaintiffs had standing because they had "suffered some actual restriction under the challenged statute because TDLR initiated regulatory proceedings against each of them pursuant to their alleged violations of the Texas cosmetology statutes and regulations" and they were alleging that statute unconstitutionally restricted their rights to practice their profession); *cf. Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979) ("When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'"); *see generally* Tex. Fam. Code §§ 261.001-267.002 (establishing procedures by which Department can take various actions, including imposing service plans on families, removing children from the home, and seeking to terminate parental rights).

We conclude that the Individual Appellees have alleged, and the record demonstrates, facts showing how the Department's allegedly invalid rule has interfered with their rights and in reasonable probability will interfere with their rights in the future by subjecting the Parents to mandatory investigation for child abuse based on reports that they have sought medical

30

care for their children's diagnosed gender dysphoria. *See Norwood*, 418 S.W.3d at 592. These facts also show how the allegedly invalid rule has interfered with the Minors' rights to equal protection under the law and in reasonable probability will interfere with their rights in the future by subjecting their families to investigation for child abuse because they have sought medical treatment for their gender dysphoria. *See id.* Construing the pleadings and the record liberally and resolving any doubt in the Individual Appellees' favor, as we are required to do, we hold that the Individual Appellees have standing to bring their APA claims against the Department. *See Texas Bd. of Chiropractic Examiners v. Texas Med. Ass'n*, 616 S.W.3d 558, 567 (Tex. 2021) (analyzing constitutional standing in APA rulemaking appeal). We conclude that they have alleged a concrete and particularized imminent injury to the Parents' constitutionally protected interest in directing their children's medical care and the Minors' constitutionally protected interest in receiving such care sufficient to establish standing and that the alleged injury "is directly traceable to" the Department's alleged rulemaking "and would be redressed here by judicial invalidation of the challenged rule[]." *Id.*

## B. PFLAG's Standing

The Department argues that PFLAG lacks standing because it does not satisfy any of the three prongs of the standard for associational standing adopted by the Texas Supreme Court. *See Texas Ass'n of Bus.*, 852 S.W.2d at 447 (adopting three-prong test first articulated in *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). "[A]n association has standing to sue on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual

31

members in the lawsuit.'" *Id.* (quoting *Hunt*, 432 U.S. at 343). We address each requirement in turn.

### 1. PFLAG's Members Would Have Individual Standing

As discussed above, the Individual Appellees have standing as individuals to assert their claims that the Department's Statement and its implementation resulted in an invalid rule, and "the rule or its *threatened* application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff[s]." Tex. Gov't Code § 2001.038(a) (emphasis added). The Department argues that other PFLAG members have suffered no cognizable harm because "[t]here are no court orders or requests for court orders pending against them, much less pending against them based on the sole claim that one of their children is taking [puberty blockers and hormone therapy]." We disagree. The Department's implementation of a policy requiring mandatory investigation of parents reported solely to have provided their children with gender-affirming medical care harms all PFLAG members with transgender children in the same way that the Individual Appellees allege that they have been harmed. The alleged concrete and particularized and actual or imminent harm is that the parents' fundamental right to direct the medical care of their children is interfered with or impaired (or threatened to be interfered with or impaired) by subjecting them to a Hobson's choice: automatic investigation for providing medical care for gender dysphoria prescribed by their doctors or attempting to avoid investigation by denying their children that medical care, which could seriously harm their children. And the PFLAG members' minor children are alleged to suffer the same concrete and particularized and actual or imminent harm that the Minors allege—interference with or impairment of (or threatened interference with or impairment of) their rights to equal protection under the law because the

32

Department's allegedly invalid rule targets their families for child-abuse investigations solely because the adolescents seek (in consultation with medical professionals) medical treatment for diagnosed gender dysphoria, i.e., puberty blockers and hormone therapy, when families whose children received the same medical treatment for reasons other than gender dysphoria would not be subject to investigation.

In addition, the Department argues that PFLAG has not identified members who are actually injured or facing imminent injury. Again, we disagree. The trial court had before it evidence of the allegedly invalid rule's effect both on the Individual Appellees who are also PFLAG members, as detailed above, and on non-appellee PFLAG members. The Families submitted a declaration and an affidavit from parent members who are not parties to the suit.

One parent of a thirteen-year-old child who has been diagnosed with gender dysphoria by a psychologist and is exploring the idea of a social transition attested that she was contacted by a Department CPS investigator days after the Department issued its statement and informed that her family would be investigated to determine if she had committed child abuse. She attested that her child is not receiving medical care related to gender identity. Her child has been seeing a psychiatrist for a few years and also sees another therapist regularly and sees a separate psychologist who specializes in Eye Movement Desensitization and Reprocessing and provides therapy to the child related to a traumatic event that occurred when the child was younger. The mother attested that even after she provided the CPS investigator with a letter from the child's psychiatrist of several years confirming that the child is not receiving any gender-affirming medical care, CPS continued to investigate by reaching out to one of the child's teachers and contacting the mother's attorney to attempt to schedule a "viewing" of the child at a public place. She refused. Her case remained open.

33

Another PFLAG member attested that her eleven-year-old child is transgender. Although her child was assigned the sex of "male" at birth, the mother attested that once her child could speak, she began expressing that she was "born in the wrong body" and "persistently and consistently asking for girl clothes and girl toys." The child's twin brother is living with cerebral palsy and other developmental disabilities that he was diagnosed with shortly after birth. The parents discussed how the child expressed herself with the child's brother's doctors and the doctors referred them to a psychologist in childhood pediatrics. The child was initially diagnosed as gender nonconforming and later with gender dysphoria. The parents have allowed her to socially transition, following their doctors' advice to let her explore her gender and to "let her be the one to lead that exploration." The mother attested that "allowing her to transition was a long, arduous, and thoughtful process," undertaken through consultation with many experts, including her pediatrician, a neurologist, an endocrinologist, and therapists. The mother attested,

> The doctors and specialists told us that transgender youth who face rejection and repression are far more likely to attempt suicide and self-harm. Faced with her depression, anxiety, and continued insistence that she was a girl, her father and I considered our decision to allow her to transition, or not, as a matter of life or death.

After seeing the "profound difference in her life for the better, and watching her thrive as her true self," the mother attested that she and the child's father decided to advocate for her and for children like her, seeking to bring awareness about transgender people within Houston's Jewish community, which they are a part of, and later by the mother and child appearing in the Texas Legislature in 2021 to testify against anti-transgender legislation. The child "testified that being transgender is 'not a choice' and that she 'would rather die than be a boy.'" Although the child is not currently undergoing medical treatment for her gender dysphoria, she is under the care of a team of

physicians and mental-health providers, who have recommended routine checkups to determine when she begins puberty so that they can determine whether she should take puberty blockers. The mother testified that shortly after the Department issued its statement, the hospital where the child was receiving care stopped providing gender-affirming medical care to transgender youth. Although the hospital announced later it would start providing such care again, the interruption in care prompted the parents to begin considering healthcare options out of state for their child and making plans to move away from Texas. The mother attested in great detail to the disruption to both parents' careers and their other child's healthcare that such a move would cause, describing it as "a last resort that would change the trajectory not just of our careers, but all of our lives." She attested that if the Department opens an investigation into their family for providing gender-affirming medical care to their child that her doctors recommend and deem medically necessary, they will seriously consider whether and when to move. The mother further attested to the psychological impact that the Department's change in policy has had on the whole family, including the child, whose sleep and studies have suffered and who fears that she will be taken away from them or that they will be forced to move away from the only home the children have ever known. The mother attested that the parents want to be able to continue to provide their child with whatever medically necessary care is recommended by her doctors, including puberty blockers, and that their "decision to follow the advice of her healthcare team is especially acute because [the child] testified before the Texas Legislature last summer that she would rather die than be a boy."

Contrary to the Department's argument that PFLAG has failed to "identify members actually injured or facing imminent injury," the Families have specifically identified at least five PFLAG members (including the three Parent Appellees) who have suffered, and who are

35

at risk to further suffer, from the "invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical,"'"—their constitutionally protected rights to care for their children and their children's rights to be treated equally under the law. *See Lujan*, 504 U.S. at 560. We conclude that PFLAG members who are at risk of being investigated by the Department based solely on reports that their children are receiving gender-affirming medical care would have individual standing to bring the claims brought by PFLAG in this suit, and therefore, PFLAG satisfies the first requirement of associational standing.

### 2. The Interests That PFLAG Seeks to Protect Are Germane to Its Purpose

The Department argues that PFLAG cannot satisfy the second requirement of associational standing because it must demonstrate not only that the interest that it seeks to protect is germane to its purpose, but also that the interest that is germane to its purpose relates to the interest "by which its members would 'have standing to sue in their own right.'" *Abbott v. Mexican Am. Legis. Caucus, Tex. House of Representatives*, 647 S.W.3d 681, 694 (Tex. 2022) (quoting *Save Our Springs All., Inc. v. City of Dripping Springs*, 304 S.W.3d 871, 886 (Tex. App.—Austin 2010, pet. denied)). The Department argues that PFLAG cannot satisfy this requirement because while "members of PFLAG would presumably have standing to sue in their own right if they suffered an injury in the form of being placed on the child-abuse registry or having their child removed from their home[,] . . . PFLAG is not an organization whose purpose is to assist parents from being wrongfully labelled child abusers." The Department points to PFLAG's statement on its website that its purpose is "[t]o create a caring, just, and affirming world for LGBTQ+ people and those who love them." They contend that PFLAG's general concern about a "caring, just, and affirming

36

world" is unconnected to its individual members' "unrelated concerns about being found to have abused their child."

PFLAG responds that the reference in its mission statement to creating "a caring, just, and affirming world for LGBTQ+ people and those who love them" does not end the inquiry into its organizational purpose. As alleged in the Families' petition and stated on its website, and as its executive director testified at the temporary-injunction hearing, PFLAG focuses on supporting, educating, and advocating for LGBTQ+ people and their families. In the petition, the Families allege that PFLAG's support of LGBTQ+ youth and their families includes "encouraging and supporting parents and families of transgender and gender expansive people in affirming their children and *helping them access the social, psychological, and medical supports* they need." (Emphasis added.) "More specifically, it includes working with PFLAG families to encourage love for and support of their transgender and gender expansive children and *to help them ensure that the children's needs are met*." (Emphasis added.) Thus, as the Families argue in their brief, "[h]elping, supporting, and advocating for parents of transgender youth in affirming their transgender identities and accessing the social, psychological, and medical supports that they need is part of PFLAG's mission." We conclude that because the allegedly invalid rule targets those parents for investigation for child abuse based on reports that their children are receiving gender-affirming medical care, PFLAG's representation of its members' interests in challenging the allegedly invalid rule is germane to PFLAG's purpose of helping, supporting, and advocating for parents of transgender youth and helping transgender youth access the medical and other support they need. Therefore, PFLAG satisfies the second requirement for associational standing.

37

### 3. PFLAG's Claims at Issue in This Appeal Do Not Require Its Individual Members to Participate

The Department argues that PFLAG does not satisfy the third requirement for associational standing because the claims asserted and relief sought require the individual PFLAG members to participate in this lawsuit themselves. They contend that the claims alleged by PFLAG require each affected member to demonstrate the particular injuries they have suffered and the relief that they are entitled to. However, as the Families point out, the basis of their claims is not individualized allegations about the investigations that they have been subjected to. Instead, the specifics of those investigations "are collateral to the general harm[s] posed by" the allegedly invalid rule, which are shared by all PFLAG members with transgender children—the threat or actuality of being investigated for child abuse solely based on a report that their child is receiving gender-affirming medical care, which impairs the parents' rights to make medical decisions for their children, and the minor children's rights to equal protection.

Even if the PFLAG members' individual experiences of the harm differ, they have identical legal claims concerning the invalidity of the rule that will be resolved by the declaratory and injunctive relief sought by PFLAG. *See Big Rock Inv'rs Ass'n v. Big Rock Petrol., Inc.*, 409 S.W.3d 845, 850 (Tex. App.—Fort Worth 2013, pet. denied) (explaining that when association seeks "prospective equitable relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured and that, consequently, prudential concerns are advanced and the association may possess standing to invoke the court's remedial powers on behalf of its members"); *see also Texas Ass'n of Bus.*, 852 S.W.2d at 448; *Hunt*, 432 U.S. at 343-44. The Department argues on reply that individualized proof of injury is necessary because the Department Statement and its implementation do not apply to all parents

with transgender children, only to those who are reported to be providing gender-affirming medical care to their children. We disagree. All parents with transgender children suffer from the same interference with or impairment of, or threatened interference with or impairment of, their rights to direct their children's medical care and their children's rights to equal protection under the law because the Department's allegedly invalid rule targets their families solely based on reports that they are providing gender-affirming medical care to their children. Needless to say, not all those reports will be true, and some parents whose transgender children are not being prescribed puberty blockers or hormones have been or will be reported nonetheless. Thus, because the injury to parents and their children may be proven by individualized evidence from representative members, but a fact-intensive inquiry of each affected individual member is not required to prove the alleged harm, that need for limited individual member participation does not defeat associational standing for PFLAG. *See, e.g.*, *Big Rock Investors Ass'n*, 409 S.W.3d at 851 (collecting cases recognizing that when claims can be proven by evidence from representative injured members, participation of those individual members does not defeat associational standing). Consequently, PFLAG satisfies the third requirement for associational standing. Because it satisfies all three requirements, we conclude that it has established associational standing to bring on behalf of its members its claims asserting that the Department Statement and its implementation constitute an invalid rule, which constituted the basis for the temporary-injunction application.[19]

---

[19] We also conclude that there is no merit to the Department's arguments that the PFLAG Injunction is improper because (1) it applies to all PFLAG members in Texas, including those that join after the PFLAG Injunction was entered, and (2) its terms are ambiguous. The PFLAG Injunction enjoins the Department to "immediately cease any intake, investigation, or assessment" solely based on allegations that the person has a minor child who is gender transitioning or receiving gender-affirming medical care upon receipt of actual notice that the person is a member of PFLAG. With regard to their first argument, the injunction's application to PFLAG members does not make it overbroad. As set forth by the trial court, it only shields those PFLAG members

## II.     Ripeness

The Department contends that the trial court lacks subject-matter jurisdiction because Voe's and PFLAG's claims lack ripeness "[t]o the extent [their] claims rest on the fact that they have ongoing investigations where the possibility exists that [the Department] might take action against them in the future." The Department argues that Voe and PFLAG lack a concrete injury, asserting that their claims "are not yet ripe because no court order affects their parent-child relationships," and further, they will not be ripe "[u]nless, and until, [the Department] obtains a final court order affecting their parent-child relationships." Alternatively, the Department asserts that Voe's and PFLAG's claims are not yet ripe "because [the Department] has not made even an *initial* determination that they engaged in child abuse." In the absence of the Department's arrival "at a definitive position that would inflict concrete harm" on Voe and PFLAG, the Department argues that Voe's and PFLAG's claims are not yet ripe. In response, the Families contend that the Department's ripeness arguments fail for the same reason their standing arguments fail—because

---

that the Department undertakes to investigate solely on the basis of reported gender transitioning of or gender-affirming medical care for a minor child. As explained above, those PFLAG members would have individual standing because they have the same injury as the Individual Appellees in this case. Contrary to the Department's argument, this is not a statewide injunction—it applies only to PFLAG members. In addition, in *Abbott v. Doe*, handed down on the same day as this opinion, we have affirmed the statewide injunctive relief granted by the trial court from the invalid DFPS Rule, meaning that the Department is enjoined from all investigations based solely on reported gender transitioning of or gender-affirming medical care for a minor child, whether the reported alleged perpetrator is a PFLAG member or not. *See Abbott v. Doe*, No. 03-22-00126-CV, -- S.W.3d --, slip op. at 47-49 (Tex. App.—Austin 2024, no pet. h.) (citing *Texas Health & Hum. Servs. Comm'n v. Advocates for Patient Access*, 399 S.W.3d 615, 620-21 (Tex. App.—Austin 2013, no pet.) (affirming statewide injunction of regulation challenged as ultra vires); *Combs v. Entertainment Publ'ns, Inc.*, 292 S.W.3d 712, 724-25 (Tex. App.—Austin 2009, no pet.) (affirming statewide temporary injunction of rule challenged under APA)). Nor is there any merit to the Department's second argument—the injunction is unambiguous in its identification of the specific actions that the Department is enjoined from taking and also whom they may not investigate or take adverse action against.

they rely on the same misapprehension of the Families' pleadings and the harms that the Families contend flow from the Department's allegedly invalid new rule and its subsequent investigations.

"Ripeness, like standing, is a threshold issue that implicates subject matter jurisdiction, . . . and like standing, emphasizes the need for a concrete injury for a justiciable claim to be presented." *Patterson v. Planned Parenthood of Houston & Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998) (citation omitted). "While standing focuses on the issue of *who* may bring an action, ripeness focuses on *when* that action may be brought." *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851 (Tex. 2000) (footnotes omitted). The ripeness doctrine addresses both the pragmatic, prudential concern of conserving judicial time and resources for real and current controversies rather than hypothetical or remote disputes and the constitutional prohibition on advisory opinions, which stems from the separation-of-powers doctrine. *Patterson,* 971 S.W.2d at 442-43.

To avoid issuing an advisory opinion, our ripeness analysis considers "whether, at the time a lawsuit is filed, the facts are sufficiently developed so that an injury has occurred or is likely to occur, rather than being contingent or remote." *Patel*, 469 S.W.3d at 78 (emphasis added). Thus, we focus on whether the case involves 'uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Patterson*, 971 S.W.2d at 442 (quoting 13A Wright et al., Federal Practice and procedure, § 3532, at 112 (2d ed. 1984)). Ripeness does not require a claimant to show that a concrete injury has occurred, provided the claimant shows the injury is likely to occur or imminent. *Gibson,* 22 S.W.3d at 852; *Patterson,* 971 S.W.2d at 442.

The Department's ripeness challenge relies on its misapprehension of Voe's and PFLAG's claims—none of their claims require the determination of factual matters that have not yet sufficiently developed. *Compare Beacon Nat'l Ins. Co. v. Montemayor*, 86 S.W.3d 260, 268

(Tex. App.—Austin 2002, no pet.) (holding claims against Texas Department of Insurance concerned abstract insurance contracts and hypothetical sets of facts and thus were "preemptive claims for contractual construction . . . to avoid regulatory enforcement"), *with City of Waco v. Texas Nat. Res. Conservation Comm'n*, 83 S.W.3d 169, 176-77 (Tex. App.—Austin 2002, pet. denied) (holding trial court had jurisdiction to hear City's UDJA claim that concerned "purely legal issue" of whether federal law prohibited state agency from issuing new permits in watershed until agency adopted necessary pollution-reduction measures; claim was ripe because purely legal question would not benefit from development of additional facts in connection with specific permit application). While it would certainly be a concrete injury if the Department made an initial determination that Voe or other PFLAG members have engaged in child abuse by providing their children with gender-affirming medical care and if the Department sought and obtained court orders affecting those families' parent-child relationships, those are not the injuries for which Voe and PFLAG seek relief. The injuries for which they seek relief are the allegedly invalid rule's interference with or impairment of the parents' fundamental right to direct their children's care and the minor children's right to equal protection. Our resolution of their claims and provision of relief for those injuries does not require the determination of facts in the context of any individual Department investigation.

Our consideration of ripeness is limited to the Families' claim for declaratory relief sought under the APA because they sought the temporary injunction challenged here solely on the grounds that the Department's alleged new rule violates the APA.[20] Thus, the only claim relevant

---

[20] As mentioned earlier, we need not address the Department's jurisdictional challenges to the Families' constitutional claims because those claims were not the grounds for the temporary injunction.

to our ripeness analysis is the Families' claim for declaratory relief based on the invalidity of the Department's new rule resulting in the investigation of Voe's family and the Department's stated intent to investigate any family for child abuse who is reported to provide gender-affirming medical care to their minor children, which would include PFLAG members. The nature of the APA claim and the injuries that Voe and PFLAG allege from the allegedly invalid rule distinguish this case from the cases relied upon by the Department to support its argument that Voe's and PFLAG's claims are not ripe.

Neither of those cases involved claims asserting an invalid agency rule under the APA that were determined to lack ripeness. *See Gates v. Texas Dep't of Family & Protective Servs.*, No. 03-11-00363-CV, 2013 WL 4487534, at \*6 (Tex. App.—Austin Aug. 15, 2013, pet. denied) (mem. op.) (affirming grant of Department's plea to jurisdiction and trial court's dismissal of claims arising from investigation of parent for child abuse); *Rea v. State*, 297 S.W.3d 379, 381 (Tex. App.—Austin 2009, no pet.) (affirming trial court's grant of Texas Medical Board's plea to jurisdiction and dismissal of doctor's claims arising from Board's investigation of him on basis that his claims were not ripe). The Department urges that these cases stand for the proposition that a declaratory-judgment action is premature if other proceedings that will affect the parties' respective rights remain pending. We disagree.

The Department contends that this Court's ruling in *Gates* compels us to conclude that Voe's and PFLAG's claims are not ripe. The Department describes our holding in *Gates* as rejecting Gates's claim that the Department violated her rights by investigating her for reported child abuse and placing her on the child-abuse registry "as unripe because the administrative appeals process challenging that designation was ongoing," citing *Gates*, 2013 WL 4487534, at \*1. That conclusion is nowhere to be found in *Gates*. Gates sued the Department and the

43

Commissioner under the UDJA, asserting constitutional claims and challenging the Department's investigation and subsequent actions against her after it received a report of child abuse against her. *Id.* She challenged the thoroughness of the investigation, her placement on the central registry of reported child-abuse cases, the fairness of the administrative-review process, and the Department's alleged improper release of confidential information. *Id.* The Department asserted in a plea to the jurisdiction that the trial court lacked jurisdiction over Gates's constitutional claims because she had not suffered a cognizable injury and the claims were not ripe. *Id.* This Court reviewed Gates's arguments on appeal "that the Department violated her due process and due course of law rights, her right to familial integrity, her equal protection rights, her right to privacy, her free exercise of religion rights, and her right to confidentiality and a 'thorough investigation' of the report of child abuse as provided by Texas statutes." *Id.* at *4. The Court concluded that "Gates did not allege or present evidence that the Department's challenged actions had 'legally affected' her relationship with her children or that she had been precluded from adopting or working in childcare," she failed to plead facts supporting "a protected property interest in addition to damage to her reputation or an interest that would entitle her to greater process than she received during the Department's investigation," and she did not contend the child-abuse registry itself is unconstitutional, and thus the trial court did not err by granting the plea to the jurisdiction. *Id.* at *5-6. Although Gates had added an APA claim to a supplemental petition, the Court concluded that Gates's allegations of invalid rules focused on the Department's specific conduct directed to her and did not identify an "agency statement of general applicability," *see* Tex. Gov't Code § 2001.003(6) (defining "rule" for purposes of APA), and thus sovereign immunity was not waived for her purported APA claim. *Gates*, 2013 WL 4487534 at *6. Our holding in *Gates* does not compel a conclusion that Voe's and PFLAG's claim of an invalid rule resulting in investigation or

44

the threat of investigations that impair parents' rights to direct their children's medical care and impair their minor children's rights to equal protection is not ripe.

In *Rea*, a doctor whom the Texas Medical Board determined had committed violations of the Medical Practice Act filed a suit, alleging statutory and regulatory violations by the Board during its investigation of him, and seeking to enjoin the Board from continuing to prosecute him and to enjoin the State Office of Administrative Hearings (SOAH) from adjudicating the complaint filed by the Board against him. 297 S.W.3d at 381. Rea challenged the Board's violation of procedural requirements in its investigation of him, but he did not allege that the Board or SOAH lacked authority to make an initial determination about the revocation or suspension of a medical license. *Id.* at 384-85 (concluding that alleged violations of statutes by Board and its decision to continue with disciplinary proceeding were preliminary to SOAH administrative hearing, not final agency action). We concluded that the Board's challenged acts were preliminary to the administrative hearing before SOAH and that because the Board was "merely *seeking* to take disciplinary action against Rea, no final decision ha[d] been made at the agency level" and the Board's acts had not yet caused Rea to suffer any concrete injury. *Id.* at 384. In other words, Rea's suit was a premature attempt by the plaintiff "to arrest the administrative process before the agency ha[d] taken adverse action" against him. *Beacon*, 86 S.W.3d at 268. In contrast, here, Voe and PFLAG do not challenge any individual determination by the Department of child abuse. Instead, Voe and PFLAG challenge the Department Statement as an invalid rule under the APA, resulting in an investigation or the threat of investigations that interfere with or impair parents' rights to direct their children's medical care and interfere with or impair their minor children's rights to equal protection. This APA challenge presents a purely legal question that will not benefit from the development of additional facts in connection with any specific Department

45

investigation—resolution of the claim does not "depend[] on the occurrence of contingent future events that may not occur as anticipated or may not occur at all." *Patterson*, 971 S.W.2d at 444.

Moreover, Voe and PFLAG need not wait for the Department to make initial or ultimate determinations that they engaged in child abuse by providing gender-affirming medical care or to seek court intervention with their parental rights for the trial court to have jurisdiction to consider whether the Department Statement constitutes an invalid rule under the APA and to grant a temporary injunction based on that claim. "[T]he purpose of section 2001.038 is to obtain a final declaration of a rule's validity before the rule is applied." *Texas Mut. Ins. Co. v. Texas Dep't of Ins., Div. of Workers' Comp.*, 214 S.W.3d 613, 622 (Tex. App.—Austin 2006, no pet.) (citing *State Bd. of Ins. v. Deffebach*, 631 S.W.2d 794, 797 (Tex. App.—Austin 1982, writ ref'd n.r.e.) ("[O]ne is not required to wait until the rule is attempted to be enforced against him before he may resort to declaratory relief.")). Here, the challenged rule is already being applied because the Department is actively investigating the Voe family and has stated it will investigate any parents who are reported to provide gender-affirming medical care to their minor children. To require Voe and PFLAG to wait to bring their APA rule challenge until the Department has determined that they have committed child abuse or obtained a court order "would defeat the purpose of section 2001.038." *Id.* Voe and PFLAG are challenging the Department's authority to conduct the investigations at all, not the end result of the investigations. *Cf. S.O. v. University of Tex.*, No. 03-16-00726-CV, 2017 WL 2628072, at *3 (Tex. App.—Austin June 15, 2017, no pet.) (mem. op.) (explaining that "[t]he nature of the controversy, therefore, is whether the University officials' act of conducting a disciplinary proceeding to consider revoking S.O.'s degree is *ultra vires*, regardless of its outcome" and that "[t]his controversy is neither hypothetical, contingent, or remote"). Voe and PFLAG do not complain about a determination of child abuse, they complain

46

that the Department has implemented an invalid rule and is conducting investigations based on that invalid rule. We therefore conclude Voe's and PFLAG's claim that the Department Statement is an invalid rule under the APA is ripe for adjudication.

## III. Mootness

The Department contends that Roe's and the Briggles' claims are moot because the Department closed out its investigations against them with a "ruled out" determination, meaning that the Department did not find abuse or neglect of the child.[21] The Department asserts that the ruled-out determinations mean that there is no longer a justiciable controversy between them and Roe and the Briggles. The Roe and Briggle Appellees disagree, asserting that the controversy between them and the Department remains live while the Department Statement remains in effect because anyone who supports their children's gender-affirming medical care in the future is subject to mandatory investigation if reported to the Department as a suspected child abuser on that basis.

"If a controversy ceases to exist—'the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome'—the case becomes moot." *Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001). Although the Department contends that "nothing in the record suggests an investigation on the same allegations will occur in the future," nothing in the record supports their contention that additional investigations cannot occur in the future. While Talbert testified that if the Department has completed an investigation and the exact same

---

[21] The Department closed its investigation into Roe with a "ruled out" determination after Roe had filed her notice of appeal from the temporary injunction issued in favor of her and Voe, and the Department advised the trial court of the closure of the investigation before the trial court ruled on the temporary injunction in favor of PFLAG and the Briggles. The investigation into the Briggles had been closed by the time of the temporary-injunction hearing. In the PFLAG Injunction, the trial court expressly concluded that the Briggles' claims were ripe (and thus not moot).

47

complaint came back in, they would "not work that case again," no evidence in the record supports a conclusion that the Department would not investigate a new complaint against these families, especially if there are allegations that their course of gender-affirming medical care has changed. In addition, according to the Department's CPS Handbook, now that Roe and the Briggles have been investigated, they are ineligible for an "Abbreviated Ruled-Out" disposition of other allegations in the future.[22] And the Department's "ruled-out" letter sent to Roe specifically provides that the fact that her role as an alleged perpetrator of child abuse in this particular investigation has been ruled out "does not preclude further involvement with your family by [the Department], including the provision of services, court involvement, or even termination of parental rights." Given that the threat of mandatory investigation remains should anyone report new allegations of child abuse based on gender-affirming medical care against Roe and the Briggles, the allegedly invalid rule created by the Department Statement continues to invade their protected interests in their fundamental rights to direct their children's medical care and the Minors' rights to equal protection under the law.[23] Accordingly, we conclude that the controversy

---

[22] Excerpts from the Department's CPS Handbook were admitted into evidence at the temporary-injunction hearing.

[23] The Department continues to mischaracterize Roe's and the Briggle's claims as "challenges to [the Department's] past investigation" and thus asserts that "the possibility of a future investigation is too speculative to support standing for a new claim." As explained at length in the section of this opinion addressing standing, the Families do not allege merely that the investigations themselves are the injury giving rise to their standing, they allege the impairment of both the Parents' right to direct their children's medical care free from the concern that they may be investigated for child abuse for "consenting to medically necessary care" and the Minors' right to seek that care. The purpose of Section 2001.038(a) is to allow plaintiffs to seek a determination of the validity of a challenged agency rule for such an alleged impairment of rights. *See, e.g.*, *Texas Dep't of Pub. Safety v. Salazar*, 304 S.W.3d 896, 903 (Tex. App.—Austin 2009, no pet.) (explaining that plaintiffs may seek both declaratory and injunctive relief because Section 2001.038's purpose "is to obtain a final declaration of a rule's validity *before* the rule is applied" (quoting *Rutherford Oil Corp. v. General Land Office of State of Tex.*, 776 S.W.2d 232, 235 (Tex.

between the parties about whether the Department Statement is an invalid rule under the APA remains live, and Roe's and the Briggles' APA claims that form the basis for the temporary injunction are not moot.

Having overruled the issue raised by the Department about mootness, we also consider whether legislation enacted in 2023 after this appeal was filed has rendered these cases moot. Although none of the parties has brought the issue to the Court's attention, and the Department has not argued that Senate Bill 14 ("SB 14") renders these cases moot or affects any of the Families' standing, "we must consider issues affecting our jurisdiction sua sponte." *State ex rel. Best v. Harper*, 562 S.W.3d 1, 7 (Tex. 2018) (citing *M.O. Dental Lab v. Rape*, 139 S.W.3d 671, 673 (Tex. 2004) (per curiam)). On May 17, 2023, after these appeals were fully briefed, the Texas Legislature enacted SB 14. The bill included Subchapter X of Chapter 61 of the Texas Health and Safety Code, titled "Gender Transitioning and Gender Reassignment Procedures and Treatments for Certain Children," which became effective on September 1, 2023. *See generally* Tex. Health & Safety Code §§ 161.701-.706. Section 161.702(b) prohibits a physician or healthcare provider from knowingly "provid[ing], prescrib[ing], administer[ing], or dispens[ing] any of the following prescription drugs that induce transient or permanent infertility: (A) puberty suppression or blocking prescription drugs to stop or delay normal puberty; (B) supraphysiologic doses of testosterone to females; or (C) supraphysiologic doses of estrogen to males." *Id.* § 161.702(3).

---

App.—Austin 1989, no writ)). The closure of these investigations does not solve Roe's and the Briggles' dilemma of whether to continue following the course of care prescribed by their children's doctors and potentially subject themselves to further investigation or to stop following that course of care prescribed by their doctors and potentially seriously harm their children.

SB 14 addresses the provision of gender-affirming medical care by physicians and healthcare providers licensed in Texas. It does not directly address the Department's Statement or codify it. The Families' allegations that the Department Statement and its implementation embody an invalid rule that interferes with their fundamental constitutional rights are not resolved by SB 14. Gender-affirming medical care is still being legally provided in other states. Therefore, the Department's policy of mandatory investigations for child abuse based solely on reports that a child has been prescribed medical care for their diagnosed gender dysphoria continues to have the effect of requiring that parents choose either to follow the course of care prescribed by their children's doctors and thus subject themselves to investigation for child abuse or to stop following their doctors' prescribed course of care and risk harm to their children. Consequently, the issues presented remain live and the Families continue to have a legally cognizable interest in the outcome. *See Williams*, 52 S.W.3d at 184.

We conclude that SB 14 does not affect our jurisdiction over these cases.

## IV. Sovereign Immunity

The Department asserts that the Families' APA claims against the Commissioner are barred by sovereign immunity.[24] The Department contends that the Commissioner is immune from the APA claims because the Department Statement is not an agency "rule" subject to APA review "because it is not a statement of general applicability that implements, interprets, or

---

[24] Although the Department asserts that all of the Families' claims—their APA claims, claims of ultra vires acts by the Commissioner and by the Governor, violations of substantive due-process rights, and violations of the Texas Constitution—are barred by sovereign immunity, as noted elsewhere, we only address sovereign immunity for the APA claims that are the grounds for the temporary injunction. Moreover, the Department does not argue that DFPS enjoys immunity from the Families' APA claims.

prescribes a law or policy," *see* Tex. Gov't Code § 2001.003(6)(A)(i), and alternatively, because it falls into the exception for statements regarding "only the internal management or organization of a state agency and not affecting private rights and procedures," *see id.* § 2001.003(6)(C). The Families respond that the Commissioner's announcement in the Department Statement that the Department was operationalizing the Governor's Directive and her subsequent implementation of the announced policy established a new agency rule, subject to challenge under Government Code Section 2001.038(a), and thus immunity is waived for their challenge to that rule's validity.

The APA allows a party to bring a declaratory-judgment action to challenge the validity or applicability of an agency rule if it is alleged that the rule or its threatened application interferes with or impairs a legal right or privilege of the plaintiff. *Id.* § 2001.038(a); *see Texas Dep't of Transp. v. Sunset Transp. Inc.*, 357 S.W.3d 691, 700 (Tex. App.—Austin 2011, no pet.). "Section 2001.038 of the APA is considered a legislative grant of subject-matter jurisdiction, such that valid claims raised pursuant to its provisions are not barred by sovereign immunity."[25] *Trinity Settlement Servs., LLC v. Texas State Secs. Bd.*, 417 S.W.3d 494, 501 (Tex. App.—Austin 2013, pet. denied) (citing *Combs v. Entertainment Publ'ns, Inc.*, 292 S.W.3d 712, 720 (Tex. App.—Austin 2009, no pet.)); *see also Texas Dep't of Pub. Safety v. Salazar*, 304 S.W.3d 896, 903-04

---

[25] The jurisdictional inquiry concerns whether the Department Statement and its implementation constitutes a "rule" as defined by the APA, and if so, whether that rule or its threatened application interferes with or impairs the Families' legal rights or privileges. *See Texas Dep't of State Health Servs. v. Sky Mktg. Corp.*, No. 03-21-00571-CV, 2023 WL 6299115, at *11 (Tex. App.—Austin Sept. 28, 2023, pet. filed) (mem. op.) (citing *Combs v. Entertainment Publ'ns, Inc.*, 292 S.W.3d 712, 720 (Tex. App.—Austin 2009, no pet.)). In their issue asserting that sovereign immunity is not waived, the Department only challenges whether the Department Statement and its implementation constitute a rule. In our standing analysis, we have already concluded that the allegedly invalid rule interferes with or impairs the Families' legal rights or privileges. Thus, in this portion of the opinion we only address whether the Department Statement and its implementation constitute a rule under the APA.

51

(Tex. App.—Austin 2009, no pet.) (holding that trial court has subject-matter jurisdiction to consider claims for declaratory and injunctive relief if claimant raises valid rule challenges under APA). "[A] challenged agency action constituting a 'rule'—as defined by the APA—must exist for a claimant to successfully invoke the trial court's subject-matter jurisdiction under section 2001.038." *Trinity Settlement*, 417 S.W.3d at 501 (citing *Slay v. Texas Comm'n on Env't Quality,* 351 S.W.3d 532, 545 (Tex. App.—Austin 2011, pet. denied) (explaining that unless "rule" as defined by APA is being challenged, "the claimant cannot obtain the declaratory relief the statute authorizes against the State, its agencies, or its agents")). Otherwise, sovereign immunity bars the cause of action. *Id.*

The APA defines a "rule" as follows:

(6)  "Rule":

 (A)  means a state agency statement of general applicability that:

  (i)  implements, interprets, or prescribes law or policy; or

  (ii)  describes the procedure or practice requirements of a state agency;

 (B)  includes the amendment or repeal of a prior rule; and

 (C)  does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures.

Tex. Gov't Code § 2001.003(6). In this case, the Families have alleged that the Department Statement is an invalid rule because it satisfies the APA definition of a "rule" and was adopted without substantial compliance with the APA's procedural requirements for promulgating agency rules. *See id.* §§ 2001.023, .028, .033, .035 (establishing requirements for notice, public comment,

reasoned justification by agency for rule, and substantial compliance). They allege that the Department Statement "is a statement of general applicability that is (1) directed at a class of all persons similarly situated and (2) affects the interests of the public at large." They further allege that the Statement set forth a new rule and enforcement policy by stating that the Department would implement the Governor's Directive and follow the law as explained by the Attorney General's opinion KP-0401, and that going forward, the Department would investigate reports of gender-affirming medical care as "child abuse." The Families allege that before the Department Statement was issued, the Department had not promulgated any rule concerning the investigation of gender-affirming medical care as child abuse and that no such investigations were being pursued by the Department at the time of the Statement. In addition, they allege that before the Statement, the Department had refused to investigate reports of gender-affirming medical care as child abuse, instead treating such reports as "priority none" and closing them without further investigation. The Families allege that after the Statement, at least nine investigations had been opened into families based on allegations that before the Statement would not have been investigated. They further allege that the Department instructed its CPS investigators and supervisors to pursue these cases in a manner that departs from longstanding agency procedures and that lacks transparency, including by instructing them not to put anything about the cases in writing. They supported these allegations with evidence at the temporary-injunction hearing.

The Department contends that the Department Statement "cannot be said to be implementing, interpreting, or prescribing a *new* law or policy." Instead, they argue, it is exactly the type of "informal agency statement that does no more than restate its own formally promulgated rules" and thus is not itself a rule, relying on *Teladoc, Inc. v. Texas Med. Bd.*, 453 S.W.3d 606, 617 (Tex. App.—Austin 2014, pet. denied) (quoting *Texas Dep't of Transp.*

53

*v. Sunset Transp., Inc.*, 357 S.W.3d 691, 703 (Tex. App.—Austin 2011, no pet.)). The Department characterizes the Statement as "merely [saying] that [the Department] would continue to comply with the law, as interpreted by the Attorney General." This characterization ignores the fact that the Attorney General's opinion expanded the definition of "child abuse" to include gender-affirming medical care obtained from medical providers, an interpretation that was new and that the Department was not complying with before the opinion, as evidenced by the fact that the Statement informed the public that "[a]t this time, there are no pending investigations of child abuse involving the procedures described in that opinion." The Department also urges that state agencies should be able to rely on the Attorney General's opinions interpreting the law without going through a formal rulemaking process.

It is well settled that in certain circumstances, "agency pronouncements that advise third parties regarding applicable legal requirements" may constitute "rules" under the APA. *Sunset Transp.*, 357 S.W.3d at 703 (collecting cases). To constitute a "rule," the "agency statement interpreting law must bind the agency or otherwise represent its authoritative position in matters that impact personal rights." *Id.*; *see also, e.g.*, *Entertainment Publ'ns*, 292 S.W.3d at 722 (emphasizing that Comptroller's stated legal interpretation would bind agency employees to apply rule and was "aimed at placing the regulated public on notice of the Comptroller's prospective blanket application of" certain section of tax code, "unambiguously expressing an intent to apply this interpretation . . . in all future cases" involving similar facts regardless of whether particular circumstances of each transaction might have resulted in different tax treatment under Comptroller's previous analysis). Here, similar to the rule at issue in *Entertainment Publications*, the Commissioner unambiguously announced that the Department would follow the interpretation of the law as explained in the Attorney General's opinion in all future cases in which the

54

Department received reports of allegations that caregivers were providing children with gender-affirming medical care. The Commissioner's stated intent to follow that legal interpretation bound Department employees to investigate any such reports as child abuse, even if those reports would not have been investigated before February 22, 2022. The Department Statement also placed the public on notice of the prospective blanket application of this interpretation by stating the Department's intent to investigate all such reports as child abuse.[26] *See also Texas Alcoholic Beverage Comm'n v. Amusement & Music Operators of Tex.,* 997 S.W.2d 651, 658 (Tex. App.—Austin 1999, pet. dism'd w.o.j.) (holding agency's memoranda to its law-enforcement agents constituted "rule" because "memoranda set out binding practice requirements," "substantially changed previous enforcement policy," and Commission's agents "not only intend[ed] to enforce, but ha[d] enforced administrative sanctions on owners and operators" of gaming machines). The evidence presented at the hearing supports the trial court's conclusion that the Department now requires investigations to be opened on all reports of gender-affirming medical care, without exception. The evidence from the Department's witness at the hearing further supports the Families' allegations that those investigations into reports of gender-affirming medical care cannot be designated a lower level of priority, such that the Department can close them without an invasive investigation. The Commissioner's intent for the Department to enforce this legal interpretation by investigating all reports of gender-affirming medical care as child abuse renders the Statement a rule because it impacts personal rights. *See Sunset Transp.*, 357 S.W.3d at 703; *see also Brinkley v. Texas Lottery Comm'n*, 986 S.W.2d 764, 770 (Tex. App.—Austin 1999, no pet.) (observing that

---

[26] The Department does not challenge the Statement's "general applicability" as that term is used in the APA.

55

agency advisory opinion regarding applicable law would have no legal effect "absent a statute that so provides or some attempt by the agency to enforce its statement against a private person"). Opening mandatory investigations into families accused of child abuse based solely on the provision of gender-affirming medical care to their children constitutes an attempt by the Department to enforce the newly expanded definition of "child abuse" against those private persons.

The Department argues in the alternative that even if the Department Statement could be considered a "rule," it would fall within the exclusion for statements "regarding only the internal management or organization of a state agency and not affecting private rights or procedures." Tex. Gov't Code § 2001.003(6)(C). The Department contends that the Statement at most "suggests that [the Department] applies the law as set out in the Attorney General's opinion when investigating and identifying child abuse" and that application of the law by the Department would not "itself have a binding effect on private parties," quoting *Slay*, at 546. Similar to their arguments asserting that investigations are not an injury and thus the Families suffer no injury from the Department Statement, the Department argues that "[i]n the child-abuse context, private rights may be affected when an abuser is found guilty of a crime or when a child is removed from a home," but that investigations do not affect private rights. We disagree with the Department— private rights are unquestionably affected by an intrusive government investigation into one's home, family life, and childrearing practices. The Legislature has unquestionably granted the Department the statutory authority to investigate reports of child abuse, even though those investigations can be invasive, as long as those investigations comport with the Department's statutory authority and its properly promulgated rules. But the Department does not have the power to decide and announce without following APA rulemaking procedures that the provision

56

of a certain type of medical care constitutes "child abuse" and that henceforth it will conduct invasive investigations of families solely on the basis of reports that their children are receiving that medical care. In addition to their right to be free from an unlawful government investigation, the families of transgender children have the fundamental right to direct their children's medical care without fear that they will be investigated and their children have the right to receive that medical treatment. The private rights of all parents of transgender children and of the transgender children themselves are affected by the Department's Statement of policy and its subsequent implementation of that policy that any report that minor children are receiving gender-affirming medical care will result in mandatory investigations for child abuse.

"[T]he core concept" in distinguishing between an agency statement that concerns only "internal management" and a "rule" is whether the agency statement has "a binding effect on private parties." *See Texas State Bd. of Pharmacy v. Witcher*, 447 S.W.3d 520, 529 (Tex. App.—Austin 2014, pet. denied) (quoting *Slay*, 351 S.W.3d at 546). "[T]o constitute a "rule" under [the APA] definition, 'an agency statement interpreting law must bind the agency *or otherwise represent its authoritative position in matters that impact personal rights.'*" *Id.* (quoting *Sunset Transp., Inc.*, 357 S.W.3d at 703 (emphasis added in *Witcher*)). "In that regard, a distinction exists between nonbinding evaluative guidelines that take into consideration case-specific circumstances—which have been held not to be a rule—and policies that dictate specified results without regard to individual circumstances, which have been held to be a rule." *Id.* The Department Statement does not constitute "nonbinding evaluative guidelines that take into consideration case-specific circumstances"—it announced a policy dictating "specified results without regard to individual circumstances": all reports of provision of gender-affirming medical care to minors will be investigated as child abuse. *See id.* The Department Statement does not fall

under the exclusion for statements "regarding only the internal management or organization of a state agency and not affecting private rights or procedures." Tex. Gov't Code § 2001.003(6)(C).

We hold that the Department Statement "is a statement implementing, interpreting, or prescribing the agency's policy that affects private rights and has implications beyond the parties to the underlying proceeding." *See Witcher*, 447 S.W.3d at 529. Therefore, it is a rule within the meaning of the APA. *See id.* (citing *El Paso Hosp. Dist. v. Texas Health & Hum. Servs. Comm'n*, 247 S.W.3d 709, 714 (Tex. 2008); *CenterPoint Energy Entex v. Railroad Comm'n of Tex.*, 213 S.W.3d 364, 369 (Tex. App.–Austin 2006, no pet.) ("Ad hoc rulemaking occurs when the agency makes a determination that has implications beyond the instant parties . . . .")). Because the Department Statement satisfies the APA elements of a "rule" and the internal-management exclusion does not apply, sovereign immunity is waived for the Families' APA claims against the Commissioner and the Department.

## V. Temporary Injunction

The Department contends that the trial court abused its discretion by granting the temporary injunctions for several reasons. They contend that (1) the Families did not demonstrate a probable right to the relief sought, (2) the trial court's injunctions upended rather than preserved the status quo, and (3) the trial court's temporary injunctions do not prevent irreparable harm but could cause it. The Families respond that the trial court properly granted the temporary injunctions because they established a probable right to relief and the temporary injunctions preserve the status quo and prevent irreparable harm. We first consider whether the temporary injunctions preserve the status quo and then turn to whether the Families established the necessary elements of a probable right to relief and prevention of irreparable harm.

## A.    Standard of Review

Whether to grant or deny a temporary injunction is within the trial court's sound discretion, and thus, we should reverse the orders granting injunctive relief only if the trial court abused that discretion. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). We must not substitute our judgment for the trial court's judgment unless the trial court's action was so arbitrary that it exceeds the bounds of reasonable discretion. *Id.* A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Id.* "To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim."[27] *Id.*

## B.    Status Quo

"A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits." *Id.* In the context of injunctions, the "status quo" is the "last, actual, peaceable, non-contested status which preceded the pending controversy." *See, e.g., Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 555 (Tex. 2016). The trial court found as follows:

> [A]n allegation about the provision of gender-affirming medical care, such as puberty blockers and hormone therapy, without more, was not investigated as child abuse by [the Department] until after February 22, 2022. The DFPS Rule changed the *status quo* for transgender children and their families. The DFPS Rule was given the effect of a new law or new agency rule, despite no new legislation, regulation, or even valid agency policy.

---

[27] We have already determined that the Families have pled and proved that they have a valid APA rule challenge against the Department.

The Department contends that at the time the trial court issued its injunctions, the Department was obligated "to investigate allegations of abuse and neglect," and that the trial court's orders that it cease all investigations into the individual Families and all PFLAG members do not maintain that status quo. They assert that preventing the Department from assessing whether reports received about the Families and other PFLAG members are actually reports of child abuse or neglect violates the Texas Supreme Court's holding in *In re Abbott*, 645 S.W.3d 276, 281 (Tex. 2022) (orig. proceeding) ("*Doe*"). We disagree with that characterization of the holding in *Doe*. In a mandamus proceeding challenging this Court's Rule 29.3 order reinstating the trial court's temporary injunction, the Texas Supreme Court sought to clarify the roles of the various government actors involved in the decisions that led to the underlying suit (and also led to the suits underlying this appeal). *Id.* at 280. The Texas Supreme Court stated that while the Governor and Attorney General "have every right to express their views on [the Department's] decisions and to seek, within the law, to influence those decisions[,] . . . [the Department] alone bears legal responsibility for its decisions" and "must assess whether a report it receives is actually 'a report of child abuse or neglect.'" *Id.* at 281 (quoting Tex. Fam. Code § 261.301(a)). The court further recognized that, "depending on the circumstances, [Rule 29.3] may authorize a court of appeals 'to preserve the status quo and prevent irreparable harm' to the parties during the pendency of the appeal, even if the temporary order has 'the same practical effect as denying supersedeas of the trial court's injunction.'" *Id.* at 282 (quoting *In re Texas Educ. Agency*, 619 S.W.3d 679, 680 (Tex. 2021) (orig. proceeding)). While the court granted mandamus relief as to the portion of the Rule 29.3 order that purported to grant statewide relief to nonparties from the Department's Statement, without commenting on the merits, the court left in place this Court's order reinstating the temporary injunction to preserve the status quo and prevent irreparable harm to the parties during

60

the pendency of the appeal, concluding that "none of the State's argument in [the Texas Supreme Court] focuses on the circumstances of this child." *Id.* at 283. The Texas Supreme Court's opinion in *Doe* does not mandate that we conclude that the temporary injunction did not preserve the status quo.

Although the Department argues that the Department Statement did not change the status quo because it merely stated that the Department would follow the Attorney General's opinion, which was interpreting existing law, including the definition of "child abuse" in the Family Code, as Justice Lehrmann recognized in her concurring opinion in *Doe*, the Department's "summary change in policy pursuant to the Governor's directive . . . served to *narrow* the discretion of [Department] employees with respect to screening reports and conducting such investigations" into allegations that minors were receiving medical care for gender dysphoria by precluding the employees from designating such cases as "Priority None." *Id.* at 287 (Lehrmann, J., concurring). The trial court heard ample evidence concerning the changes to the Department's procedures for handling cases involving allegations of gender-affirming medical care that were reported after February 22, 2022. *See Butnaru*, 84 S.W.3d at 211 ("The trial court does not abuse its discretion if some evidence reasonably supports the trial court's decision."). The trial court's temporary injunctions in these cases, like the one in *Doe*, "temporarily reinstate[] [the Department's policies as they were prior to the February 22 directive, leaving [the Department] free to screen and investigate reports based on its preexisting policies regarding medical abuse and neglect." *Doe*, 645 S.W.3d at 286.

The evidence presented here supports the trial court's determination that the status quo is preserved by its narrowly tailored injunction preventing the Department from investigating and taking action against the Families for child abuse or neglect "solely based on allegations that

they have a minor child or are a minor child who is gender transitioning or alleged to be receiving or being prescribed medical treatment for gender dysphoria."[28]

### C.      Probable Right to Relief Sought

The trial court concluded that the Families have a probable right to the relief sought by their APA claims, based on the evidence that it heard concerning the Department's changes in policy after the Department Statement was issued. When reviewing a temporary injunction, "we need not resolve the ultimate merits of the plaintiffs' claims in order to determine whether they established a probable right to relief." *Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 917 (Tex. 2020). The Department contends that to establish that their claims are likely to succeed on the merits, the Families must prove that (1) gender-affirming medical care can never be a form of child abuse, and it is always safe and reversible and (2) the Department "created a 'new rule' without the proper procedures or otherwise acted outside its authority under state or federal law."

The Department again relies on mischaracterizing the Families' claims to challenge the trial court's conclusion that the APA claims will probably succeed on the merits. The Department asserts that the factual premise underlying the Families' claims is that

---

[28] As Justice Lehrmann recognized with regard to the *Doe* order, these orders do not "preclude [the Department] from investigating reports that a child diagnosed with gender dysphoria is receiving treatment that is medically unnecessary or inappropriate. To the contrary, it requires [the Department], as has always been its responsibility, to investigate reports of child abuse or neglect allegedly committed by a person responsible for a child's care, custody, or welfare." *In re Abbott*, 645 S.W.3d, 276, 286 (Tex. 2022) (orig. proceeding) ("*Doe*") (Lehrmann, J., concurring). The temporary injunctions only bar the Department "from initiating investigations and making referrals based *solely* on the new grounds set out in the Governor's directive" and the Department Statement. *Id.* Thus, the orders do not change the status quo with regard to the Department's preexisting statutory authority.

gender-affirming medical care is always safe and reversible and that they failed to prove that is true. Contrary to what the Department argues, the Families' APA claims do not require them to prove that gender-affirming medical care is always safe and reversible (which would be an impossible task with virtually any course of medical treatment, including even most over-the-counter drugs). We need not delve into the scientific details of the relative safety and efficacy of gender-affirming medical care to address the actual factual premise of the Families' claims, which is this: the Department "singled out the established course of medical care for transgender youth with gender dysphoria and deemed it presumptively abusive, not only treating it differently than all other medical care, but treating it differently than the same care for non-transgender youth." What the Families challenge by their APA claims are the Department's "actions in unilaterally and unlawfully changing the definition of child abuse, declaring the provision of medically necessary gender affirming care to be abuse, and subjecting all parents alleged to have secured such care for their transgender adolescents to invasions of privacy and infringements of parental autonomy." As we discussed at length above, the Families sufficiently alleged and supported with evidence both that the Department Statement and its implementation impairs their fundamental rights and that the Department Statement and its implementation constitute a "rule" within the meaning of the APA that the Department adopted without following the proper rulemaking procedures under the APA. *See Butnaru*, 84 S.W.3d at 211 (requiring only some evidence that reasonably supports the trial court's decision under abuse-of-discretion standard). We hold that at a minimum the Families have established a probable right to relief on their claim that the Department Statement is an invalid

rule because it is a rule within the meaning of the APA and it was adopted without following proper rulemaking procedures. This claim is sufficient to support the trial court's temporary injunctions.[29]

### D. Probable, Irreparable Injury

"An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204. The trial court concluded that, absent injunctive relief, the Families would suffer probable, imminent, and irreparable injury, including but not limited to:

- being subjected to an unlawful and unwarranted child abuse investigation;

- intrusion and interference with parental decision-making;

- the deprivation or disruption of medically necessary care for the parents' adolescent children;

- the chilling of the exercise of the right of Texas parents to make medical decisions for their children relying upon the advice and recommendation of their health care providers acting consistent with prevailing medical guidelines;

- intrusion into the relationship between patients and their health care providers;

- gross invasions of privacy in the home and school, and the resulting trauma felt by parents, siblings, and other household members;

- outing an adolescent as transgender;

- adverse effects on grades and participation in school activities;

- fear and anxiety associated with the threat of having a child removed from the home;

---

[29] The Families have also established a probable right to relief on their APA claims that the Department Statement is invalid because the Department lacked statutory authority to promulgate it and because it is unconstitutional, given our conclusions that the rule was made without following proper rulemaking procedures under the APA and that the Families established the impairment of fundamental constitutional rights.

- increased incidence of depression and risk of self-harm or suicide;

- having to uproot their lives and their families to seek medically necessary care in another state;

- being placed on the child abuse registry and the consequences that result therefrom; and

- criminal prosecution and the threat thereof.

(Bullet points added.) The Department argues that the Families have not shown irreparable harm because "[t]hey speculate as to harm that could befall them if the investigations do not resolve in a favorable way." They further argue that during the months the Department continued its investigations, no investigation "went beyond ensuring the wellbeing of the child and confirming the child either was not on [gender-affirming medical care] or was receiving [gender-affirming medical care] as part of medically necessary treatment."

Again, these arguments mischaracterize the harms that the Families allege and that the trial court found were supported by some evidence. The Families challenge the Department's authority to promulgate and implement the invalid rule in the Department Statement, and they allege irreparable harm from the "actual and imminent violations of [their] fundamental rights to care for their children, the threat to essential medical care, and equal protection violations" from the potentially unlawful investigations. As previously discussed at length in connection with the issues of standing and sovereign immunity, the trial court had before it ample evidence to support a conclusion that the Department Statement constitutes an invalid rule that results in an actual or imminent impairment of the Families' fundamental rights.[30] *See id.* at 211. The harms listed by

---

[30] We disagree with the Department's contention that the trial court's delay of two months in granting the PFLAG Injunction demonstrates the lack of need for an injunction to preserve the status quo, as well as the lack of imminent irreparable harm. We fail to see how the length of time

65

the trial court related to that conclusion are being subjected to an unlawful and unwarranted child abuse investigation; intrusion and interference with parental decision-making; the deprivation or disruption of medically necessary care for the parents' adolescent children; and the chilling of the exercise of the right of Texas parents to make medical decisions for their children relying upon the advice and recommendation of their health care providers acting consistent with prevailing medical guidelines. We also conclude that there is some evidence to support the other irreparable harms identified by trial court.[31] *See id.*

Having concluded that the temporary injunctions preserve the status quo and that the Families established the temporary-injunction requirements of a probable right to relief and prevention of irreparable harm, we hold that the trial court properly granted the temporary injunctions.

a court needs to rule bears on whether an injunction is necessary to maintain the status quo. And although some time passed between the hearing and the trial court's ruling, the evidence at the hearing showed "factual circumstances of an enduring nature." *Intercontinental Terminals Co., LLC v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 894 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (holding trial court did not abuse its discretion by finding irreparable harm five months after evidence was presented to trial court). The Department does not identify any specific evidence that it contends was no longer accurate or applicable at the time of the trial court's ruling. *See id.* The harm that the Families assert here "is of a continuing nature:" interference with the parents' rights to direct their minor children's medical care and the minor children's equal right to treatment and the "ramifications . . . caused by that interference." *Id.*

[31] The only harm that the Department alleges that it will suffer is the irreparable harm that the State suffers when it cannot "enforce its *duly enacted*" laws. *Texas Ass'n of Bus. v. City of Austin, Tex.*, 565 S.W.3d 425, 441 (Tex. App.—Austin 2018, pet. denied) (quoting *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018)) (emphasis added). As explained above, nothing in the temporary injunction precludes the Department from enforcing the "duly enacted" laws allowing it to investigate child abuse and neglect. The only thing the temporary injunction precludes is the Department's enforcement of an invalid rule requiring mandatory investigation of families for child abuse based solely on reports that they are providing gender-affirming medical care to their minor children.

**CONCLUSION**

Having overruled all of the issues raised by the Department, we affirm the trial court's temporary injunctions.

_____
Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Theofanis

Affirmed

Filed:   March 29, 2024